[No. D043944. Fourth Dist., Div. One. Apr. 4, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON JENNINGS, Defendant and Appellant.

COUNSEL

Richard P. Siref, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Scott C. Taylor and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

Defendant Jason Jennings appeals from a postjudgment order to modify restitution. Jennings argues that the trial court erred in failing to apply the proceeds paid to his victim by his insurance carrier in a civil settlement against the amount of restitution ordered by the court in Jennings's criminal case. We conclude that the trial court should have offset Jennings's restitution obligation by his insurer's payments to the victim to the extent the payments were made to cover the costs of items included in the court's restitution order.

## II.

## PROCEDURAL AND FACTUAL BACKGROUND

### A.  *Factual background·*

On September 27, 2002, Jennings lost control of his vehicle while driving in the City of San Diego on Fairmont Avenue toward the entrance to westbound Interstate 8. The vehicle crashed into a concrete bridge railing on the right side of the road and overturned. Jennings's passenger, Aleah Hockridge, was ejected. Jennings's vehicle eventually landed on Hockridge, causing her to sustain major injuries including head trauma, a fractured leg and clavicle, and multiple lacerations. The results of a preliminary alcohol screening and blood test indicated that Jennings had been driving with a .16 blood-alcohol level.

### B.  *Procedural background*

#### 1.  *Jennings's guilty plea and sentencing*

The San Diego County District Attorney filed an amended felony complaint charging Jennings with one count of driving under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a)) and one count of

driving with a blood-alcohol level of .08 or greater and causing injury (Veh. Code, § 23153, subd. (b)). The complaint further alleged that Jennings personally inflicted great bodily injury within the meaning of Penal Code section 12022.7, subdivision (a).[1]

On January 23, 2003, Jennings pled guilty to driving under the influence of alcohol and causing injury, and admitted the enhancement for inflicting great bodily injury. The remaining charge was dismissed and sentencing was left to the trial court's discretion. On April 17, 2003, the trial court sentenced Jennings to a term of five years' probation with conditions, including 120 days of work furlough. The court also ordered Jennings to pay the victim restitution in the amount of $108,678.77, pursuant to section 1202.4, subdivision (f).

### 2. *The civil settlement with Hockridge*

On September 22, 2003, Hockridge signed a settlement agreement to accept $105,000.00 from the California State Automobile Association Inter-Insurance Bureau (CSAA) in exchange for releasing Jennings and his mother, Janet Jennings, from further civil liability. Hockridge's attorney signed the settlement agreement on October 2, 2003, indicating that he had explained the release and its legal effect to Hockridge.

According to the settlement agreement, in exchange for $105,000, Hockridge agreed to "forever and fully release[], aquit[], and discharge[], Janet Jennings and Jason Jennings . . . of and from all claims, demands, damages, . . . actions and causes of action of every kind and nature, known or unknown, existing, claimed to exist, or which can ever hereafter arise out of or result from or in connection with a certain accident, casualty, or event which occurred on or about September 27, 2002 . . . ." The document also conditioned execution of the release on "an agreed allocation of the settlement amount of 15 percent to medical expenses and 85 percent to pain and suffering . . . ."

### 3. *Jennings's requests to modify the restitution amount*

In late 2003, Jennings moved the court to offset the $108,678.77 he had been ordered to pay as victim restitution by $105,000—the amount his insurance company tendered to Hockridge as a result of the civil settlement.[2] On January 9, 2003, the People opposed Jennings's request to offset the restitution order by $105,000. However, the People conceded that pursuant to

---

[1] All further statutory references shall be to the Penal Code unless otherwise indicated.

[2] The record does not contain Jennings's motion, nor does it contain evidence of the date on which Jennings first filed a motion to modify the restitution amount.

*People v. Bernal* (2002) 101 Cal.App.4th 155 [123 Cal.Rptr.2d 622] (*Bernal*), a brief analysis needed to be done characterizing the defendant's payments thus far as being credited toward civil or criminal losses. The People acknowledged that a " 'trial court must offset against defendant's restitution obligation monies paid to the victim by the defendant's insurance carrier for losses subject to the restitution order' [citation]," stating, "it seems clear that a victim may not recover twice for the same identical loss." However, the People argued that only $15,750 of the $105,000 civil settlement amount should be credited against Jennings's restitution obligation because this was the portion of the settlement that was allocated to Hockridge's medical costs, as opposed to her pain and suffering.[3] The People also requested that the court modify the restitution order to reflect additional medical expenses Hockridge had incurred subsequent to the date of sentencing.

The court held hearings on the matter on January 13 and 21, 2004. On January 21, the parties stipulated to an increase in the restitution obligation in recognition of Hockridge's additional medical expenses, and the court modified the restitution amount to $113,487.77. After hearing arguments from both parties regarding whether any offset was appropriate, the court concluded that Jennings was entitled to no offset under *Bernal* because, according to the court, Jennings was "not the insured." The court stated, "it is his mother who is the insured, and based on that fact alone I distinguish *Bernal* and find that Mr. Jennings is entitled to no offset based on the insurance carrier refund to the victim."

On February 6, 2004, Jennings filed a motion to modify the restitution order and reconsideration of the court's previous ruling. In support of the motion, Jennings provided a declaration from his mother in which she stated that (a) Jennings was an insured under the policy, (b) Jennings's name was on the declarations page of the insurance policy, (c) Jennings had used his earnings from summer jobs to help her pay for "extra expenses," including the insurance premiums, and (d) the insurance company had indicated that it had no subrogation rights for claims paid on behalf of either Jennings or his mother. Jennings also submitted a CSAA document entitled "Automobile Policy Declarations" that listed Janet and Jason as drivers on policy No. 2F-05-02-8. The People challenged the motion on both procedural and substantive grounds, arguing that Jennings had presented no new facts or

---

[3] Fifteen percent of the $105,000 settlement amount that was to go toward medical expenses is $15,750.

law, and disputing that Jennings had paid the insurance premiums. The People submitted a declaration from the victim's attorney in the civil case stating that information as to who had purchased the policy had not been raised during the settlement discussions.

On March 5, 2004, the court held a hearing on Jennings's motion to modify and reconsider the previous ruling as to Jennings's restitution obligation. The trial court disagreed with Jennings's attorney that the additional evidence offered to the court was sufficient to allow the court to offset Jennings's restitution obligation by the amount paid to the victim in the civil settlement. The court ordered that its previous ruling regarding modification of the restitution order would stand.

Jennings appeals from the court's order denying his request to modify the restitution obligation pursuant to section 1237, subdivision (b), which allows challenges to "order[s] made after judgment, affecting the substantial rights of the party."

III.

DISCUSSION

A. *Jennings is entitled to an offset for payments made by CSAA to Hockridge*

Jennings argues that the trial court should have applied the $105,000 CSAA paid to settle Hockridge's civil claims against him and his mother toward the $113,487.77 in restitution he owes Hockridge under the court's restitution order. The trial court did not allow Jennings to offset the insurance company's payments against his restitution obligation because the court determined that the insured on the CSAA policy was Jennings's mother, and not Jennings.[4] Although a trial court's "allocation of restitutionary responsibility" is reviewed for an abuse of discretion, an order resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion. (*People v. Draut* (1999) 73 Cal.App.4th 577, 581 [86 Cal.Rptr.2d 469], quoting *In re S.S.* (1995) 37 Cal.App.4th 543, 550 [43 Cal.Rptr.2d 768].)

---

[4] The trial court stated: "Okay. Well, I think *Bernal* is not on point for this reason: *Bernal* talks about the defendant who is the insured, and in this case Mr. Jennings is not the insured, it is his mother who is the insured, and based on that fact alone I distinguish *Bernal* and find that Mr. Jennings is entitled to no offset based on the insurance carrier refund to the victim. So the restitution is the amount that I stated. That's my ruling."

■ In challenging the trial court's order, Jennings contends that the trial court should have applied the rule announced in *Bernal, supra,* 101 Cal.App.4th at pages 167–168, to his situation because his insurer paid his victim to settle claims against him and his mother. The *Bernal* court concluded that payments made to the victim by the defendant's insurance company to settle civil claims on behalf of the defendant satisfies section 1202.4, subdivision (a)(1)'s mandate that the victim receive restitution payments " 'directly from the defendant.' " (*Bernal, supra,* 101 Cal.App.4th at p. 168.) Thus, under *Bernal,* payments made to the victim by the defendant's insurer in settlement of the victim's civil claims against the defendant should offset the defendant's victim restitution obligation to the extent those payments indemnified the victim for losses covered by the restitution order. (*Ibid.*)

Although the People initially conceded below that Jennings was an insured on the CSAA policy within the meaning of *Bernal,* on appeal the People contend that the trial court did not abuse its discretion in denying Jennings's request to offset the amount CSAA paid because "[t]he court properly exercised its discretion in finding appellant was not the insured on the policy that paid the civil settlement." Thus, the People argue, this case is more closely aligned with the factual scenario of *People v. Hamilton* (2003) 114 Cal.App.4th 932, 941–942 [8 Cal.Rptr.3d 190] (*Hamilton*) than that of *Bernal.* In *Hamilton,* the court concluded that a defendant could not apply payments made to the victim by his mother's insurance company to offset his victim restitution obligation. The *Hamilton* court distinguished *Bernal* on the basis that the insurance payments made to Hamilton's victim were made on behalf of Hamilton's mother, not Hamilton himself. (*Hamilton, supra,* 114 Cal.App.4th at pp. 941–942.) We conclude that *Bernal,* rather than *Hamilton,* controls this case, and that the trial court erred as a matter of law in determining that Jennings was not an insured within the meaning of *Bernal.*

### 1. *Bernal and Hamilton*

In a factual situation similar to the one presented here, the defendant in *Bernal* was convicted of driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)) and causing great bodily injury (§ 12022.7, subd. (a)) pursuant to a plea agreement. (*Bernal, supra,* 101 Cal.App.4th at p. 158.) Among the conditions of Bernal's probation was that he make restitution to his victim for her current and future medical bills. (*Ibid.*) The victim submitted a statement of loss to the probation officer setting forth approximately $10,000 in losses. Some time later, Bernal's insurance company tendered $15,000 to the victim to settle any claims she may have had against Bernal. When Bernal sought modification of the restitution order, the prosecutor argued that the $15,000 settlement amount was not enough to cover the

victim's current and past medical bills. The trial court concluded that Bernal had satisfied his restitution obligation because the victim had released her claims against him, and because his insurance company had paid her $15,000, which was more than the victim's claimed losses.

On an appeal by the prosecution, the appellate court considered and decided two issues. First, it concluded that the victim's written release of all claims against the defendant did not prevent the trial court from ordering additional restitution in the criminal case. (*Bernal, supra,* 101 Cal.App.4th at p. 164.) Second—and more significant for purposes of this case—the court concluded that payments made by Bernal's insurance company to the victim for losses covered by the restitution order should offset his restitution obligation. (*Id.* at p. 168.)

In reaching this conclusion, the *Bernal* court noted that payments made by a defendant's insurer are fundamentally different from payments by independent and distinct third party sources because (1) payments made to the victim by the defendant's insurer are not fortuitous, but rather are bargained for since, unlike payments from third party sources, the defendant procured the insurance; (2) the defendant paid premiums to keep the policy in force; (3) the defendant has a contractual right to have the insurance company make payments to the victim on his behalf; and (4) the insurance company has no right of indemnity or subrogation against the defendant. (*Bernal, supra,* 101 Cal.App.4th. at p. 168.)[5] For these reasons, the *Bernal* court determined, the relationship between an insured and his insurer is such that payments made by a defendant's insurer are actually payments made to the victim directly from the defendant for purposes of section 1202.4. (*Bernal, supra,* 101 Cal.App.4th at p. 168.)

In *Hamilton, supra,* 114 Cal.App.4th at page 943, the court distinguished the facts before it from those in *Bernal,* and determined that the defendant could not offset his restitution obligation by the settlement amount paid by his mother's insurer in settlement of the victim's claims against her. In *Hamilton,* the defendant, Hamilton, shot and seriously injured a man while the man was performing work for the defendant and the defendant's mother. (*Id.* at p. 935.) After the victim filed a civil lawsuit against Hamilton and his mother, "[Hamilton's mother's] insurer paid [the victim] between $25,000 and $30,000 to settle the claim on her behalf and obtained [the victim's]

---

[5] On the basis of these factors, the *Bernal* court distinguished *People v. Birkett* (1999) 21 Cal.4th 226 [87 Cal.Rptr.2d 205, 980 P.2d 912], and *People v. Hove* (1999) 76 Cal.App.4th 1266 [91 Cal.Rptr.2d 128]—cases in which courts had not permitted defendants to offset their restitution obligations by the amounts victims received from third parties—noting that in those cases, "the sources of the victims' reimbursement were completely distinct and independent from the defendants" and that "[t]he payments from such sources were simply fortuitous events from which the defendants should not benefit." (*Bernal, supra,* 101 Cal.App.4th at p. 166.)

release of claims and dismissal with prejudice of the lawsuit against Ms. Hamilton and Hamilton." (*Ibid.*, fn. omitted.) The *Hamilton* court concluded that although the defendant's mother's insurance company had tendered a settlement sum to the victim of his crime, Hamilton could not offset the settlement payments against his restitution obligation because the only relationship Hamilton had to the insurance company was the fact that it insured his mother. (*Hamilton, supra,* 114 Cal.App.4th at p. 942, citing *People v. Birkett, supra,* 21 Cal.4th at p. 246 [defendant to pay entire restitution amount to victims, despite fact that victims' insurers had already partially reimbursed victims for losses]; *People v. Hove, supra,* 76 Cal.App.4th at p. 1272 [defendant required to pay full restitution despite fact that Medicare and MediCal had paid all of victim's medical expenses].)

In distinguishing the facts before it from those in *Bernal*, the *Hamilton* court noted that "there is no evidence that the settlement paid by Ms. Hamilton's insurer was made on Hamilton's behalf. The evidence is to the contrary." (*Hamilton, supra,* 114 Cal.App.4th at p. 943.) Specifically, unlike the defendant in *Bernal*, Hamilton had not procured or maintained the insurance, had no contractual right to require payments to be made on his behalf, and was potentially subject to an indemnity claim by the insurer. (*Hamilton, supra,* 114 Cal.App.4th at pp. 941–942.) In contrast to *Bernal*, the *Hamilton* court noted that: "The settlement and release agreement signed by [the victim] expressly releases Ms. Hamilton; it does not mention Hamilton except in the caption in [the victim's] civil case against Hamilton and his mother. A letter from Ms. Hamilton's insurer dated March 27, 2002, transmitting to her a copy of the signed release, states: 'Pursuant to your request, enclosed are copies of the signed release, dismissal and settlement check we issued to resolve the claim made against you by [the victim].' Finally, a letter from Ms. Hamilton's attorney . . . states: 'I am happy to advise that the Offer to Compromise in the amount of $30,000 has been accepted which will release and dismiss you from this lawsuit. We were also able to extricate your son, Eric, with respect to the civil action, obtaining a Request for Dismissal with Prejudice.' " (*Id.* at p. 943.)

Based on this information regarding the settlement between Hamilton's victim and Hamilton's mother, the *Hamilton* court determined that "the settlement paid by Ms. Hamilton's insurer was made on *her* behalf," not on Hamilton's behalf. (*Hamilton, supra,* 114 Cal.App.4th at p. 943, italics added.) Thus, the victim's receipt of payments in *Hamilton* was "due to two fortuitous events: Ms. Hamilton's procuring insurance coverage and the insurance policy covering Hamilton's acts." (*Id.* at p. 942.) The court stated, "Hamilton should not benefit from these circumstances. [Citations.]" (*Ibid.*) Because the settlement amount paid by Ms. Hamilton's insurer was not made "directly on behalf of Hamilton," the court concluded, "it cannot be offset against Hamilton's victim restitution obligation." (*Id.* at p. 943.)

■ Thus, after *Bernal* and *Hamilton*, the question a court must answer when faced with a request to offset a criminal restitution obligation is whether the defendant seeking the offset for an insurance settlement payment is an insured on whose behalf the settlement payments were made.

2. *Jennings was an insured on whose behalf CSAA settled with Hockridge*

In *Bernal*, the question whether the insurance company's payment was made on the defendant's behalf was not at issue. (See *Bernal, supra,* 101 Cal.App.4th at pp. 155–168.) In this case, despite the fact that the parties did not raise Jennings's status as an insured under the CSAA policy, and that the issue was, in fact, conceded by the People in briefing,[6] the court raised the issue on its own and concluded that Jennings was not an insured. Based on this finding, the court determined that, like the defendant in *Hamilton*, Jennings was not entitled to receive credit for CSAA's settlement payment to Hockridge. However, there is no evidence to support the trial court's conclusion. Rather, the only evidence presented to the court established that, unlike in *Hamilton*, Jennings *was* an insured under the CSAA policy.[7]

Specifically, Jennings submitted a document entitled "Automobile Policy Declarations" issued by CSAA, which listed *both* Janet and Jason as drivers on policy No. 2F-05-02-8. No one disputed the authenticity of this document, which clearly reflects the fact that Jennings was an insured under the policy. Presumably, Jennings and his mother paid a higher premium for the policy covering both of them than Jennings's mother would have paid to insure only herself.[8] Thus, unlike the payments in *People v. Birkett, supra,* 21 Cal.4th at page 246, and *People v. Hove, supra,* 76 Cal.App.4th at page 1272, the

---

[6] In opposing Jennings's initial request to modify the restitution, the People stated: "In the case before the court, the victim's mother has already received a monetary settlement from the *defendant's insurance carrier* for $105,000." (Italics added.)

[7] We note that the trial court distinguished Jennings's situation from the facts of *Bernal* by concluding that Jennings was not *the* insured in this case. It is unclear whether the trial court interpreted *Bernal* as requiring that a defendant be the sole insured under a policy (i.e., the insured) as opposed to one insured among others (i.e., an insured) for purposes of offsetting restitution. In any case, we do not read *Bernal* as requiring that a defendant be the sole insured on an insurance policy in order to receive credit for an insurance company's payment made on his behalf.

[8] Additionally, the record reflects that at some point after the accident, CSAA would no longer insure Jennings and required his exclusion from the policy. If Jennings had not been an insured under the policy at the time of the accident, then CSAA would have had no need to "exclude" Jennings from further policy coverage.

payment made to Hockridge by CSAA was a direct result of the fact that Jennings had procured automobile insurance.[9]

■ The dissent asserts that Jennings did not procure the insurance, arguing that because there is no evidence that he sought out or selected the insurance policy, "[h]e did not get it or obtain it." (Dis. opn., *post*, at p. 62.) We see no basis to draw a distinction between persons who, for whatever reason, delegate to a spouse, family member, or other household member the decisionmaking power with regard to purchasing automobile insurance, and those who seek out and select the insurance themselves. The point is that the person is an insured driver. In our view, under *Bernal*, the term "procure" means to get or to obtain. Under this definition, we conclude that Jennings did in fact procure insurance.[10]

Additionally, the settlement agreement here, unlike the release in *Hamilton*, establishes that the settlement amount paid by CSAA was made "directly" on Jennings's behalf, as well as on his mother's behalf. The settlement agreement confirms that CSAA tendered $105,000 to Hockridge in exchange for her release of claims against both Jennings and his mother. The settlement document also states that its execution was conditioned on "representations by Defendants that $105,000 represents the policy limits of all policies of insurance which are available to them to cover this occurrence . . . ." Further, the agreement was entered into and signed by Hockridge, Jennings's mother, *and* Jennings himself.

Moreover, the fact that CSAA paid Hockridge $105,000 to settle her claims provides further support for the conclusion that CSAA made settlement payments on Jennings's behalf, and not just his mother's. Vehicle Code section 17151 limits the liability of a vehicle owner who is not at fault in an accident to no more than $15,000 for the injury of one person. (Veh. Code § 17151, subd. (a).)[11] Thus, Jennings's mother's maximum liability in the civil action was $15,000. On this record, we can therefore infer that any amount over $15,000 that CSAA paid to settle Hockridge's claims was made to settle claims against Jennings, and not his mother.

---

[9] To "procure" means to "get[]or obtain[] something." (Black's Law Dict. (8th ed. 2004) p. 1244, col. 2.)

[10] Although the dissent states that the trial court made a factual finding that Jennings "neither personally procured nor purchased the policy" (dis. opn., *post*, at p. 62), the record establishes that the trial court made no such finding. Rather, the trial court simply concluded that Jennings was not "the insured." This conclusion was erroneous as a matter of law.

[11] Section 17151, subdivision (a) of the Vehicle Code provides in pertinent part that "[t]he liability of an owner, bailee of an owner, or personal representative of a decedent imposed by this chapter and not arising through the relationship of principal and agent or master and servant is limited to the amount of fifteen thousand dollars ($15,000) for the death of or injury to one person in any one accident . . . ."

The facts of this case are quite different from those in *Hamilton*, on which the People rely. In *Hamilton*, the insurance policy was not an automobile insurance policy. Although the *Hamilton* court never identified the type of policy Hamilton's mother maintained, from the facts we infer that Hamilton's mother was covered through either a general liability policy or a homeowner's policy. (See *Hamilton, supra*, 114 Cal.App.4th at p. 935 [insurance at issue covered shooting that occurred while victim was doing work for insured].) Unlike the defendant in *Hamilton, supra*, 114 Cal.App. 4th 932, Jennings relies not only on his relationship with his mother, who is an insured and whose insurer paid to settle potential claims against her, but also on his *own* relationship with the insurer as an insured on whose behalf the settlement payments were made. In addition, the fact that Hockridge received partial payment covering her losses was not due to "fortuitous events," as in *Hamilton*, but rather, to the fact that Jennings had procured insurance that covered his acts. (Cf. *Hamilton, supra*, 114 Cal.App.4th at p. 942.) Thus, the source of the payment to Hockridge cannot be said to be "completely distinct and independent" from Jennings.

Under the dissent's view, based on its assumption that Jennings did not pay for the insurance,[12] he is not entitled to receive the restitution offset required under *Bernal*. The dissent would have us hold that in addition to establishing that his insurance company made payments to the victim for the same losses identified in the restitution order, a defendant must show that he individually paid for the insurance. We do not think *Bernal* requires this.

██ *Bernal* holds simply that settlement payments made to a victim by the defendant's insurance carrier must be offset against the defendant's restitution obligation "to the extent those payments are for items of loss included in the restitution order." (*Bernal, supra*, 101 Cal.App.4th at p. 168.) For purposes of this rule, who paid the premiums is irrelevant. The rule requires nothing more than an inquiry into whether the defendant has insurance covering the loss at issue, whether the insurance carrier made payments to the defendant's victim on the defendant's behalf, and whether the payments were for losses covered by the restitution order.

The dissent focuses on only one portion of the *Bernal* court's justification for announcing a rule that payments made by a defendant's insurer can be

---

[12] The dissent asserts that the trial court's "factual conclusion" that the defendant did not purchase the policy is "fully supported." (Dis. opn., *post*, at p. 62.) However, the trial court never made a factual finding that Jennings did not pay for the insurance—it simply concluded that Jennings was not "the insured" without the issue of who paid the premiums ever having been raised. Additionally, the record does contain evidence that Jennings paid, at least in part, to maintain the CSAA insurance policy. Jennings submitted a declaration from his mother in which she stated that money Jennings earned during college went to pay for his "extra expenses," which included his insurance premiums.

used to offset a defendant's restitution obligation—i.e., that payments by a defendant's insurer are different from other third party sources of payment in part because a defendant has paid premiums to maintain the policy in force. (See *Bernal, supra,* 101 Cal.App.4th at p. 168.) However, we are not convinced that this particular justification must be present in every case in order to entitle a defendant to an offset. Whether a person directly paid the premiums on a policy is fundamentally unlike the other three reasons cited by the *Bernal* court in support of its rule that an insured may offset payments made by his insurer to a victim against his restitution obligation. (See *Bernal, supra,* 101 Cal.App.4th at pp. 167–168.) Whether the defendant procured the insurance in question, whether the defendant has a contractual right to have payments made on his behalf, and whether the insurer has a right to indemnity or subrogation against the defendant, each goes to the heart of the concept of being "insured." In contrast to these factors, "the question who paid the premiums on the policy is irrelevant to determining who is an insured under the policy." (*Alex Robertson Co. v. Imperial Casualty & Indemnity Co.* (1992) 8 Cal.App.4th 338, 346 [10 Cal.Rptr.2d 165] [defendant insurer possessed no duty to defend plaintiff company even though plaintiff had paid the premiums on policy at issue because third party was "insured" under policy].)

■ We think the relevant inquiry for purposes of *Bernal* is whether the defendant has obtained insurance, and is thus an "insured," and not the manner by which the insured procured the insurance coverage or how much he may have paid for it.[13] Any individual, regardless of how he or she obtained the insurance has a contractual right to have payments made by the insurer on his behalf such that his "insurer has no right of equitable subrogation" against him "with respect to a loss or liability for which the

---

[13] The rule the dissent would apply raises a number of difficult issues that the dissent fails to address. For instance, under the dissent's approach, how much would a defendant have to pay toward insurance premiums in order to be entitled to an offset for the insurer's settlement payments? What is the impact of the dissent's proffered rule for a stay-at-home parent who relies on a spouse's income to pay for his or her insurance? Would the dissent make an exception and decide to apply *Bernal* in a circumstance where the nonpaying individual was, unlike its description of the defendant here, something other than "an impecunious college student"? We think it is wholly unnecessary to open a virtual Pandora's box regarding which insurer payments can be considered to be "directly from" the insured based on whether or not the insured himself wrote a check to the insurance company. If the defendant is an insured on whose behalf the insurer paid the victim, as he was in *Bernal,* there is no need for a court to delve into the particulars of how the defendant came to be an insured. If the defendant is not an insured on whose behalf the payments were made to the victim, as was the case in *Hamilton,* the result is equally simple. It is enough, for purposes of *Bernal,* that the defendant is an insured on whose behalf the insurer paid the victim.

insured is covered under the policy." (*Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13, 21 [115 Cal.Rptr.2d 179].) Thus, rather than try to determine how the insurance was procured, a court must determine simply whether or not the insurer's payments to the victim were made on behalf of the defendant as a result of the defendant's status as an insured. In our view, if a defendant has obtained insurance that covers the victim's loss, irrespective of how the defendant went about procuring the insurance (e.g., by purchasing it himself or by having someone else purchase it, etc.), and that insurance results in the payment to the victim, *Bernal* applies.

We recognize that there are objectives—apart from simply providing victim indemnification—that underlie the state's policy of requiring a criminal defendant to pay restitution to his victim. As the dissent notes, rehabilitation of the defendant and deterrence of further crime are at least two other objectives cited by courts as grounds for imposing restitution on criminal defendants. (See *Bernal, supra*, 101 Cal.App.4th at pp. 161–162.) However, our review of the statute's provisions suggests that the *primary* purpose of victim restitution is to fully reimburse the victim for his or her economic losses. (See *id.* at p. 168.) The legislative intent identified in subdivision (a)(1) of section 1202.4 is that the victim be made whole again. Additionally, the fact that victim restitution may be ordered only to cover economic losses, despite the fact that such a rule may frustrate the goals of rehabilitation and deterrence in cases in which there has been no economic loss, suggests that victim indemnification is the principal concern of subdivision (f).

We note further that the objectives of rehabilitation and deterrence are independently addressed by subdivision (b) of section 1202.4, which requires a court impose a "separate and additional restitution fine [in addition to that to be paid to the victim pursuant to subdivision (f)], unless it finds compelling and extraordinary reasons for not doing so . . . ." The fact that a court must impose a restitution fine *in addition* to restitution imposed pursuant to section 1202.4, subdivision (f), contradicts the dissent's assertion that Jennings "could have escaped all personal responsibility for restitution" and that allowing an offset in this situation "steals" away the rehabilitative and deterrent effect of restitution. (Dis. opn, *post*, at pp. 63, 60.)

We conclude that the rule announced in *Bernal, supra*, 101 Cal.App.4th at pages 167–168, applies in this case. Jennings is thus entitled to offset at least some portion of the payment CSAA made to Hockridge against his restitution obligation.[14]

---

[14] We note that reaching a different result would have serious and, we think, unintended implications—i.e., that the only individuals who would be able to offset insurance settlement payments would be automobile owners, and not other insured drivers. There was no showing that Jennings owned the vehicle he was driving or that he could have purchased automobile

C. *The amount CSAA paid to Hockridge for her medical expenses should offset Jennings's restitution obligation*

According to *Bernal*, the "trial court must offset against [defendant's] restitution obligation monies paid to [the victim] by [the defendant's] insurance carrier for *losses subject to the restitution order*." (*Bernal, supra,* 101 Cal.App.4th at p. 165, italics added.) The restitution order in this case obligates Jennings to pay restitution covering Hockridge's medical expenses. Only the portion of Jennings's civil settlement that covered these economic losses may be used to offset the amount Jennings is obligated to pay Hockridge under the court's order for restitution. According to the civil settlement, 15 percent of the $105,000 agreement amount was directed toward Hockridge's medical bills.[15] Thus, Jennings, through his insurer, has theoretically already paid Hockridge $15,750 toward her medical bills. It is likely, however, that some portion of this amount went to pay for attorney fees. Only that portion of the settlement payment that was directed to cover Hockridge's medical bills and did not go toward attorney fees should be offset against the amount of Jennings's criminal restitution obligation.[16]

IV.

CONCLUSION

The trial court abused its discretion in concluding that Jennings may not offset the payment made by his insurance company as part of a civil settlement against his obligation to reimburse the victim for her medical expenses, pursuant to section 1202.4, subdivision (f). The evidence before the court established as a matter of law that the settlement payment CSAA made to Hockridge was made on behalf of both Jennings and his mother. Pursuant to *Bernal, supra,* 101 Cal.App.4th 155, Jennings's restitution obligation

---

insurance on his own. If Jennings did not own the vehicle, it is questionable whether he could have purchased an automobile insurance policy. Thus, if the *Bernal* rule applies only to those who individually purchase automobile insurance for themselves, then only those defendants who own their own cars would receive the benefit of an offset. We do not think *Bernal* intended to make a distinction between automobile owners and nonowners. Rather, the *Bernal* rule is meant to apply to a driver who has procured automobile insurance, regardless of whether or not that individual is a vehicle owner.

[15] Jennings does not challenge the settlement's allocation of funds. We therefore do not consider possible questions regarding whether the purported allocation of settlement funds must be considered in determining the proper amount of offset.

[16] We recognize that there could also be an issue as to how much of the settlement payment should be credited to Jennings because it was made not only on his behalf, but also on behalf of his mother. We decline to consider this issue, as neither party raised or discussed the issue. We note that the People previously conceded that Jennings should be credited for the entire portion of the settlement allocated to Hockridge's medical expenses.

should be modified to reflect a credit for the amount tendered by his insurance company to pay for Hockridge's medical expenses.

V.

DISPOSITION

The order of the trial court is reversed, and the case is remanded with directions to the trial court to modify the amount of Jennings's restitution obligation. The trial court shall make a finding as to what portion of the $15,750 allocated to medical expenses went toward attorney fees. The trial court shall offset the restitution obligation by an amount equal to $15,750, less the amount determined to have been used to pay attorney fees.

McIntyre, J., concurred.

**BENKE, Acting P. J.,** Dissenting.—*People v. Bernal* (2002) 101 Cal.App.4th 155, 165–168 [123 Cal.Rptr.2d 622], held that a court must offset against a defendant's direct restitution obligation monies paid by his insurance company to his victim for losses subject to the restitution order. In the present case the majority extends *Bernal* by requiring an offset of monies paid to defendant Jason Jennings's victim by what, in the context of direct restitution law and the record in this case, can only reasonably be described as his mother's insurance company. I disagree with *Bernal* and I disagree with the majority's extension of its holding. I, therefore, respectfully dissent.

### A. *Bernal*

Penal Code section 1202.4, subdivision (a)(1), provides: "It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution *directly* from any defendant convicted of that crime." (Italics added.)

The statutory requirement of a defendant's direct restitution to a victim rests on the concept that such direct payment will emphasize to the defendant the seriousness of the crime or crimes committed. As *Bernal* itself notes, " 'Restitution "is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused. Such a penalty will affect the defendant differently than a traditional fine,

paid to the State as an abstract and impersonal entity, and often calculated without regard to the harm the defendant has caused. Similarly, the direct relation between the harm and the punishment gives restitution a more precise deterrent effect than a traditional fine." [Citations.]' [Citation.]" (*People v. Bernal, supra*, 101 Cal.App.4th at p. 162; see also, e.g., *People v. Birkett* (1999) 21 Cal.4th 226, 246 [87 Cal.Rptr.2d 205, 980 P.2d 912]; *People v. Crow* (1993) 6 Cal.4th 952, 957 [26 Cal.Rptr.2d 1, 864 P.2d 80]; *In re Brittany L.* (2002) 99 Cal.App.4th 1381, 1387–1388 [122 Cal.Rptr.2d 376].)

My objection to *Bernal* is that the nature of insurance is antithetical to a core purpose of direct restitution. Insurance is in essence a means of transferring, distributing and sharing risk. (1 Appleman on Insurance 2d (Holmes ed. 1996) ch. 1, §§ 1.2–1.4, pp. 3–23; see *San Diego Housing Com. v. Industrial Indemnity Co.* (2002) 95 Cal.App.4th 669, 684 [116 Cal.Rptr.2d 103]; *Richardson v. GAB Business Services, Inc.* (1984) 161 Cal.App.3d 519, 523 [207 Cal.Rptr. 519].) As such, insurance dilutes the monetary responsibility for an insured actor's conduct and dissipates the direct monetary impact on actors for their civil, or in this case criminal, wrongdoing.

If rehabilitation and deterrence are core purposes of direct victim restitution, which I believe they are, then allowing a defendant to offset a direct restitution obligation with monies paid by his liability insurer effectively disengages the amount of direct restitution the defendant must pay from the calculation of the harm caused and thus steals from the restitution obligation its intended rehabilitative and deterrent effect.

The court in *Bernal* supports its conclusion that the monies paid a victim by the defendant's insurer should be an offset against a restitution obligation by noting that if such offset is not allowed, the victim might receive a windfall. (*People v. Bernal, supra*, 101 Cal.App.4th at pp. 166–168.) As *Bernal* itself acknowledges, however, double recovery to the victim is permissible where the victim's own insurance company pays the victim and the defendant is ordered to make full direct payment as well. (*Id.* at p. 166; see also *People v. Birkett, supra*, 21 Cal.4th at p. 246; *People v. Hamilton* (2003) 114 Cal.App.4th 932, 940–941 [8 Cal.Rptr.3d 190].) Moreover, California has long permitted windfalls when they are the by-product of socially useful devices. Thus, this state adheres in tort law to the collateral source doctrine (*People v. Birkett, supra*, 21 Cal.4th at p. 247, fn. 19) and statutorily

supports the awarding of punitive damages. (Civ. Code, §§ 3294, 3294.5.) Since the Legislature has declared direct restitution a socially useful device, it is inconsequential that it may in some cases result in a crime victim receiving, to one degree or another, a windfall.

In addition to these fundamental differences with *Bernal*, I also have a somewhat narrower, but I believe significant, difficulty with its holding. Penal Code section 1202.4, subdivision (j), provides in part: "Restitution collected pursuant to this subdivision shall be credited to any other judgments for the same losses obtained against the defendant arising out of the crime for which the defendant was convicted." Under this provision an insurer ultimately liable on a judgment is entitled to have its liability reduced by the amount of restitution paid by a criminal defendant. (See *People v. Hamilton, supra*, 114 Cal.App.4th at p. 942; *People v. Clifton* (1985) 172 Cal.App.3d 1165, 1168 [219 Cal.Rptr. 904].) The reverse is not true: the statute does not provide the criminal defendant with any credit for amounts paid on a civil judgment. (*People v. Hamilton, supra*, 114 Cal.App.4th at p. 942; *People v. Clifton, supra*, 172 Cal.App.3d at p. 1168.) Thus the Legislature has expressed a clear preference that payment come first and foremost from criminal defendants and only then from the myriad of other people and entities potentially liable on a civil judgment. *Bernal* of course reverses this statutory preference: if a trial court follows *Bernal* and gives a criminal defendant credit for a judgment paid by his insurer, the trial court will not be able to reduce, as required by Penal Code section 1202.4, subdivision (j), the amount of any civil judgment.[1]

### B. *Jennings*

Accepting for the sake of argument that *Bernal* was correctly decided, I still could not join the majority opinion in this case since, in my view, it unjustifiably expands *Bernal*.

Noting that Penal Code section 1202.4, subdivision (a)(1), requires restitution be paid directly to the victim by the defendant, *Bernal* concludes that payments from the defendant's liability carrier qualify as coming "directly from the defendant" because, "(1) the defendant *procured* the insurance, and unlike the other third party sources, its payments to the victim are not fortuitous but precisely what the defendant bargained for; (2) *the defendant paid premiums* to maintain the policy in force; (3) the defendant has a contractual right to have payments made by his insurance company to the

---

[1] *Bernal* also appears to allow individuals to insure themselves for automobile-related crimes they may commit, something that is prohibited elsewhere in the law. (See, e.g., Civ. Code, § 2773; Ins. Code, § 533; *J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1020–1025 [278 Cal.Rptr. 64, 804 P.2d 689].)

victim, on his behalf; and (4) the defendant's insurance company has no right of indemnity or subrogation against the defendant." (*People v. Bernal, supra,* 101 Cal.App.4th at p. 168, italics added.)

It is logical, and of significance to the court in *Bernal,* that in order for an insurance policy to qualify as "direct payment" to a victim, the defendant must have both "procured" the policy and "paid for the premiums." Only then can it be said the defendant has made something like direct restitution.

Even by *Bernal's* definition, the payment of insurance monies to the victim here cannot reasonably be described as having come "directly from the defendant." The facts of this case are clear. The defendant at the time of the crime was an impecunious college student. His college and living expenses were paid by his mother. The vehicle he was driving at the time of the crime was owned by and registered to his mother. He was a named insured on what even defense counsel described as his mother's automobile insurance. There is no evidence at all that the defendant sought out or selected the insurance policy here. He did not get it or obtain it. Nor did he pay the premiums on the policy. Defense counsel conceded that the defendant did not pay the insurance premium in full "or anywhere near his proportion." By declaration, defendant's mother stated that the defendant worked during vacations and gave money to her to help offset his expenses, including the automobile insurance premiums. However, the record does not reflect what portion of the limited monies he gave his mother for general expenses were actually paid toward insurance. It appears his mother decided what she would use the money for and how much of it was to be used for any particular necessity at any particular time.

Given this state of the record, the trial court did not abuse its discretion in concluding the defendant was not an "insured" for purposes of *Bernal.* (*People v. Draut* (1999) 73 Cal.App.4th 577, 581 [86 Cal.Rptr.2d 469].)

The only basis upon which my colleagues can find reversible error is that the trial court failed to correctly apply *Bernal* so as to create an offset of medical expenses. As I have noted, faced as we are with the facts presented below, and faced as we are with the fully supported factual conclusion that the defendant neither personally procured nor purchased the policy here, the majority's offset operates as a significant expansion of *Bernal.*

Respectfully, extending *Bernal's* holding to anyone insured under an automobile insurance policy as long as the victim has been compensated, further dilutes Penal Code section 1202.4's requirement of a "direct" payment from the defendant to the victim and extends the meaning of "procured" past any interpretation intended by *Bernal.*

Had the entire settlement here of $105,000 been allocated to medical expenses, the defendant could escape not only civil responsibility by virtue of an insurance company paying the amount owed, he could have escaped all personal responsibility for restitution. I am not prepared to eliminate the sentencing court's power and, equally important, its obligation under Penal Code 1202.4 to order direct restitution to victims and assure society that the defendant fully understands the import of his criminal conduct.

I would affirm the trial court's order.

A petition for a rehearing was denied April 29, 2005, and respondent's petition for review by the Supreme Court was denied July 27, 2005. Kennard, J., was of the opinion that the petition should be granted.