Filed 3/17/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079488, E081708 |
| v. | (Super. Ct. No. RIF2000128) |
| ROBERT MICHAEL TAFOYA, | OPINION |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from the Superior Court of Riverside County. Charles J. Koosed, Judge. Affirmed in part, reversed in part, and remanded with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Over a five-year period, defendant Robert Michael Tafoya stalked and harassed

E.R. in multifarious ways. He regularly appeared at E.R.'s workplace where he watched

and bothered her, gained access to her car to leave flowers, followed or tracked her when

she went shopping, made numerous Facebook posts in which he held himself out to be

involved in a relationship with E.R. and claimed to be the father of one or more of E.R.'s

three children, fraudulently applied to family law court for custody and visitation orders

respecting E.R.'s children, and then fraudulently sought a default judgment by forging the

signature of another on the proof of service of his family law filings. He also showed up

at the children's school purportedly to pick them up when students were being dropped

off for school in the morning. Defendant's conduct continued unabated for several years

despite the issuance of restraining orders protecting E.R. and her children. Following a

jury trial, defendant was convicted of stalking (Pen. Code, § 646.9, subd. (b)),[1] perjury

(§ 118a), attempted child abduction (§ 278), and filing false documents (§ 115, subd. (a)).

Defendant was sentenced to an aggregate term of 25 years and eight months in prison and

appealed.[2] Later, after the restitution hearing, defendant appealed the restitution order.

On appeal from the convictions (E079488), defendant argues that (1) his stalking

conviction must be reversed because his conduct in making Facebook posts was protected

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] After the "Appellant's opening brief" was filed, defendant filed a motion for the appointment of a new appellate counsel. We treated that motion as a petition for writ of habeas corpus, which has been considered along with the instant appeal and decided by a separate order.

by the First Amendment; (2) there is insufficient evidence to support the attempted child abduction conviction where he acted pursuant to a court order and where his conduct did not constitute an overt act towards the accomplishment of the crime; and (3) his conviction for filing false documents in count 9, and the perjury convictions for counts 8 and 10, did not contain false statements.

On appeal from the order for restitution to the victim (E081708), defendant argues that the court abused its discretion in ordering payment to cover moving expenses because the court used the wrong standard, the request was not supported by a verification of necessity by law enforcement or a mental health provider. Defendant also argues that if the convictions for stalking and attempted child abduction are reversed, so, too, must the restitution ordered for those offenses be reversed.

We reverse count 10 and remand for resentencing; in all other respects we affirm.

**BACKGROUND**

A. *Prosecution Evidence*

1. *Stalking Evidence*

E.R. moved to the Riverside area from El Salvador in 2001, when she was 16 years old. In 2002, she married Jose Pina (Jose). E.R. graduated from high school in 2003. E.R. and Jose had a daughter in 2005, B.P. E.R. and Jose eventually divorced. In 2008 or 2009, she began working at a fast-food restaurant. By this time, E.R. had two children: B.P. (female, born in 2005) her oldest daughter with Jose, and M.R. (female, born in 2008) who was not Jose's child, but Jose had taken care of M.R. since she was a baby and helped raise. M.R.'s biological father lives in Washington State, where E.R.

3

also lived at one point. However, M.R. considered Jose to be her father. Jose and E.R. coparented B.P. and M.R., and Jose saw both girls at least once a week.

E.R. was the assistant manager at a fast-food restaurant, where she worked with Hugo Esqueda (Hugo) the restaurant's manager, for approximately 12 years. Sometime in 2015, E.R. became familiar with the defendant for the first time, who had become a regular customer at the restaurant. Defendant would regularly come into her workplace and talk with E.R.'s sister (who also worked at the restaurant), but once her sister stopped working at the restaurant, defendant focused on E.R. Defendant sat inside the restaurant for hours at a time and just watched E.R. Defendant attempted to court E.R. despite language differences, and in the early days, on one occasion E.R. went out to dinner with the defendant.

Defendant bothered E.R. at her workplace and would talk to E.R.'s daughters when they came to work with her before school hours. Hugo saw defendant bothering E.R. and her daughters at the restaurant regularly and commented on it to E.R. Hugo asked defendant to leave many times because E.R. told Hugo that she felt harassed by defendant and that he was interfering with E.R.'s ability to perform her job. E.R. also would tell defendant to leave her alone but everything was a game with defendant.

In January 2016, E.R. needed to find a cheaper place to live because her partner and the father of her then unborn child broke up with her. Defendant offered to find E.R. housing using his position as a city employee. One of E.R.'s friends from work suggested to E.R. that she should marry defendant for immigration purposes and live with him while the process was arranged, but E.R. made it clear to defendant she was not

4

interested in dating him or "being together" with him. E.R. did not think defendant considered her his fiancé and denied that defendant believed so or that there was "anything romantic" between them.

Defendant took pictures of them together and made posts on Facebook about E.R. and her daughters, in which he portrayed himself as romantically involved with E.R. Sometimes he stood outside of E.R.'s apartment by the window and took pictures of E.R. and her daughters while they were inside. He also photographed E.R.'s daughters from inside the apartment, posting them on Facebook without E.R.'s permission.

E.R. felt sorry for the defendant because she would see him standing outside her apartment and the restaurant crying. One time she allowed defendant into her apartment. She hugged him and defendant then tried to kiss her. E.R. told him to get away from her and to go home.

Defendant did not stay away, and his behavior exacerbated over time. On one occasion, defendant entered E.R.'s apartment and refused to leave when asked to do so by E.R., so E.R. slept in a room with her daughters after locking the bedroom door. The next morning, she found defendant, who had stayed in the living room, preparing breakfast and setting the table in her kitchen.

That was the last straw, so E.R. told defendant she could no longer be his friend and asked him to stop coming to her apartment and work, but he did not stop; he continued coming to her apartment and her work and bothering her daughters. In April 2016, E.R. had to call the police when he was at her workplace bothering E.R.'s daughters.

5

Defendant was undeterred; he brought flowers for E.R. and left them on her car daily. He waited for E.R. in the parking lot of her workplace and intercepted her there, preventing her from getting out of her car when E.R. had to run a work errand. Defendant continued coming to E.R.'s workplace even after E.R. obtained a restraining order.

Defendant also began to show up wherever E.R. and her daughters went and photographed them despite their objections. E.R. suspected that defendant was tracking her somehow since he was always following her, and she did not know how he found her. One day, E.R. took her daughters to the shopping mall, where defendant appeared while they were shopping in a store. E.R. told defendant to buy some clothing because he smelled bad and then suggested he buy some bath products at another store. He took pictures of E.R. and her daughters as they walked around the mall. He offered to buy E.R. a ring from a jewelry store at the mall, which she interpreted as defendant playing around "[j]ust for fun." At the jewelry store, defendant took pictures of E.R. trying on engagement rings.

On another occasion, when E.R. was shopping with her daughters at a department store, defendant came up behind them and threw a stuffed animal at them in the toy section, scaring M.R. E.R. was surprised to see defendant there, but defendant told her that someone told him they had seen her there. E.R. later found a device for the phone inside her car that allowed him to track her, and on another occasion she found a cell phone under her car.

Defendant even forced E.R. to allow him to attend a prenatal lab appointment against her will, showing up at her apartment, getting into her car, and refusing to leave. Defendant became possessive and obsessed with E.R. and wanted to be inside her home. E.R. was afraid of defendant, but she was too scared to call the police because she did not know how to communicate in English and had never called the police before. Instead, E.R. talked to defendant, told him to stop his behavior, informed him that she could no longer be friends with him and that she did not want him coming over to her house or her workplace. Nevertheless, defendant continued to show up to E.R.'s workplace and house.

Defendant would stand outside of her workplace for many hours, waiting for E.R. to finish her work shift, although E.R. told him repeatedly that she was not interested and did not want anything to do with him. In April 2016, E.R. called the police on defendant for the first time; her sister and brother-in-law, who were at E.R.'s workplace that day, prevented defendant from leaving prior to the police arriving. Defendant was arrested and E.R. obtained a restraining order in June 2016. Upon defendant's arrest, a framed photograph of E.R. was found in his car.

Despite the restraining order, defendant continued to come to E.R.'s home and workplace and continued to talk to E.R.'s daughters. He continued to leave flowers on her car so that she knew he had been there, and while E.R. reported these incidents to the police on many occasions, defendant was always gone by the time police arrived. He posted pictures of himself and E.R. on Facebook and left copies of the same pictures on E.R.'s car.

7

In 2016, E.R. and her daughters moved in with her ex-husband Jose, for protection because defendant was bothering them. Jose, E.R. and her daughters moved twice and B.P. and M.R., had to change schools. E.R. stopped using social media and was in fear all the time. Jose, E.R. and her daughters lived first on Van Buren Street in Riverside. But at some point, E.R. encountered defendant outside the apartment when she took out the trash, causing her to become frightened, and to call the police. Jose found damage to his vehicle several times during 2016.

E.R. also believed that defendant was entering her car because she would find the contents of her car in disarray as if someone had searched it. Defendant took objects, including a tablet from her car and a bicycle from her porch. He would then show up immediately afterwards and tell her that the area in which she lived was dangerous and that she should move in with him in his neighborhood. Prior to meeting defendant, E.R. had never experienced a car break-in or a theft from her porch during the four years she lived at her apartment.

Among the incidents of vandalism to Jose's truck during this period, one occurred when E.R. had borrowed it, and on this occasion all four tires were slashed. Another incident occurred when Jose found a long written message in pen on the back of the truck, which was signed "Twilight," a nickname that defendant called himself. E.R. sent defendant a message, telling defendant she knew it was him, and defendant replied that she should use her own car. E.R. had an active restraining order against defendant at the time. Separately, Jose found damage to his work truck, including a cut hose to the gas

8

tank, causing Jose to be afraid of driving his work truck for fear defendant would damage the brakes or do something else.

During the time E.R. stayed with Jose, she was fearful all the time and was afraid to send her daughters to school. Defendant found E.R. at the address on Van Buren Street, so E.R. and Jose moved to another apartment on Magnolia Street to elude defendant, but defendant found them again. Less than a year after moving to Magnolia Street, E.R. and her daughters moved again. Jose remained in the apartment on Magnolia Street after E.R. and her daughters moved out.[3] On November 29, 2016, E.R. obtained another restraining order against defendant because he kept bothering her.

Defendant then tried to access E.R.'s daughter, B.P., at her school, by leaving a gift for her at the front office. It was a necklace with a note inside the box that said, "[T]o [B.P.], they lied to Mom, then Mom lied to you, but I will never leave your side. I'm always around. I love you, [B.P.] Home is waiting. Poop." The note was signed, "Twilight te amo." Defendant believed the girls called him "Poop" affectionately. According to E.R.'s daughter M.R., she called defendant "poop" in a bad way.

Defendant continued to post pictures on Facebook. When E.R. had her third daughter, defendant posted a picture of a baby that was not her child and shared the post with E.R.'s family members, pretending that it was defendant's baby with E.R. He also

---

[3]     On cross-examination, defendant asked Jose if a woman ever came to Jose's apartment on Magnolia Street looking for E.R. in June 2019, but Jose denied that anyone came to the residence asking if E.R. lived there. Previously, E.R. had testified that no one had ever attempted to serve her with documents at the Magnolia Street address, stating she had moved from that address well before 2019. E.R. had not lived at that address since defendant had found that address.

9

took photos from E.R.'s social media accounts and posted them on his accounts as his own, some with alterations, adding messages of love to "my" girls, and sending messages to E.R.'s daughters via Instagram. In one message to B.P., defendant told her that he had left a phone for her outside the residence, which E.R. found and destroyed.

He continued to write messages and posts about E.R.'s daughters well after the issuance of the restraining order. He left toys for E.R.'s daughters at the residence. He posted about E.R.'s third daughter on Facebook, indicating that he had participated in the selection of the baby's name, implying he was the baby's father, and expressing disappointment that E.R. later decided not to give the name defendant chose to the third daughter.

E.R. denied that defendant was the father of any of her three daughters and was not there when she gave birth to any of her children. Genetic testing excluded defendant as the biological father of any of E.R.'s children. In fact, E.R. had not even met defendant when B.P. and M.R. were born. There was never any romantic relationship between defendant and E.R. E.R. never had sex with defendant and never lived with him.

E.R. continued to report defendant to the police and get updated restraining orders, at some point, every day, but that did not stop defendant. Although he would hide from the police, defendant was arrested on several occasions and a criminal protective order was issued, which he also violated.

On October 23, 2017, E.R. met with Detective Christian Vaughan with the Riverside Police Department's domestic violence unit. E.R. reported she had received a book written by defendant with a dedication to her and the girls. Defendant was arrested

10

on March 20, 2018. On July 12, 2019, defendant pleaded guilty to making a criminal threat (§ 422) as part of a plea agreement. He also pleaded guilty to several violations of a restraining order. Defendant was released on July 12, 2019.

E.R. eventually moved to another apartment, thinking she was in danger. Defendant stopped showing up at places she went for a few months, but then his conduct resumed. One day, after defendant started showing up again, E.R. found a cell phone taped to the underside of her car. After nearly a year at the new apartment, defendant found her at the new address, so E.R. had to move again. However, eventually defendant found her again, and began showing up where her car was parked, and began leaving flowers and notes for her again. E.R. stayed at the third apartment for less than a year before she had to move to a fourth apartment, after defendant found her yet again at the new address.

E.R. discovered that defendant was seeking custody of M.R. when contacted by an investigator from the district attorney's office, Hector Santana. E.R. feared that defendant would kidnap her and her daughters.

B.P. was 16 years old at the time of trial. She did not recognize defendant. B.P. indicated that defendant and E.R. never dated, although she recalled defendant coming around when she was about 11 years old and E.R. was pregnant with her baby sister. B.P. saw her father, Jose, around five times per week. B.P. said that M.R. also spent time with Jose and called him "Dad." B.P. never called defendant "Dad." B.P. was afraid of defendant and angry about his claims of being her father. B.P. denied defendant was ever with the family during holidays and was not in any family pictures.

11

M.R. was 13 years old and in eighth grade at the time of trial. M.R. considered Jose as a father to her and that she called him "dad" when she was younger. She did not recognize defendant in the courtroom. However, she did remember that there was a man named "Robert" who would hang around when she was in second or third grade, and would follow her and B.P. from table to table at her mother's workplace, which made her feel uncomfortable. M.R. thought it was strange that defendant wanted to be near her mom and B.P. all the time and she recalled defendant buying her gifts like barbie dolls and teddy bears.

M.R. recalled defendant continually tried to get into their apartment, even though E.R. did not want him there, which made M.R. uncomfortable and "weirded out." M.R. remembered defendant showing up at places that she, B.P. and mother went, like the department store, which she thought was creepy and weird. Defendant was never a part of M.R.'s family and she never thought of him as a father. According to M.R., her mother is scared because of defendant and does not want M.R. and B.P. to be alone anymore. M.R. met her biological father in the state of Washington and knows that defendant's claim that he is M.R.'s father is a lie. Her family had to move a lot because her mother was scared that defendant would find them and "do something bad." Moving and changing schools was hard for M.R., and she was sad at the thought of having to move out of California.

M.R. was also uncomfortable and scared that defendant remembered personal information about her and was "obsessed."

B.P. and M.R. were also bothered by defendant's presence and his behavior when defendant tried to hug B.P. and M.R. and would stay close to them at their mother's workplace, even after E.R. physically pushed defendant away from her daughters and asked the restaurant's manager to help her. The restaurant manager called the company's office and reported defendant. Undeterred, defendant continued to come into E.R.'s workplace and bothered B.P. and M.R. daily. At some point, E.R. quit her job because she felt harassed by the defendant.

By the time of trial, defendant's behavior had continued for five years unabated, even after E.R. remarried and had a fourth child with her new husband. Defendant continued making (or directing) Facebook posts even after his arrest and while he was in custody. When defendant was incarcerated, he gave a close friend Jazmine Mendiola Lineberger (Jazmine) his Facebook log-in credentials and asked Jazmine to make Facebook posts on his behalf; defendant would dictate to Jazmine what he wanted to say in the posts, word for word. The posts often claimed that defendant was the father of B.P. and M.R. Defendant also asked Jazmine to send private messages from his account to people he knew.

According to Detective Vaughan, since 2016, defendant has used the same batch of photographs repeatedly to represent his alleged relationship with E.R. It appeared to the detective that E.R. had allowed defendant into her life for a brief moment, and there was no other information or evidence to substantiate his claims of a familial relationship with E.R. or her daughters aside from that one batch of photos.

Detective Vaughan testified that defendant's behavior in this case was characteristic of stalking and included "[h]arassing, persistent behavior that goes unchecked, undaunted, and turns from what to most might seem mundane or not troublesome into terrorizing somebody." He found six different Facebook accounts for defendant. Some of defendant's posts included images copied or cropped from E.R.'s Facebook account and reposted on his own page.

Detective Vaughn found no evidence to support defendant's assertions that he and E.R. had cohabitated. While Vaughan investigated 12 or 13 documented incidents involving defendant and E.R., he estimated that there were likely twice as many undocumented cases because E.R. did not report everything to law enforcement, as she was frustrated with their inability to stop defendant and "had almost given up." Vaughan had never dealt with another stalking case like this one, in which a defendant's obsession spanned such a long period of time and increased. He believed that defendant posed an imminent threat to E.R. and her daughters.

2. *Attempted Child Abduction Evidence*

In March 2018, defendant showed up at B.P.'s middle school during the morning school drop-off. The campus security guard was standing on the street corner when he noticed defendant standing on the sidewalk in front of the school. As defendant walked towards the security guard, the guard asked defendant what he was doing, to which defendant responded that he was there to pick up his daughter. The guard found that odd, as it was the time of day when children were being dropped off. When defendant asked how students arrive and how parents bring their children to school, the guard told him

14

that it would be better to pick his daughter up in the front office because that is where parents pick their children up during the day.[4]  Defendant did not go to the office, but instead lingered on the street until about 20 minutes after the bell had rung for school.

The guard thought this was strange, so he went into the school and reported the defendant's behavior to the assistant principal, and when he went back outside, defendant finally crossed the street and walked away from the school.  Additionally, Jose learned that defendant had tried to pick up Jose's daughter, B.P., from her school and feared defendant would try to kidnap B.P.

The People presented evidence of eight Facebook posts made between June 17, and December 24, 2019, which portrayed defendant as the estranged father of M.R. and B.P., who sought reconciliation of his family.

Investigator Santana worked with the district attorney's child abduction unit (CAU).  On October 15, 2019, defendant called the CAU at the district attorney's office and spoke with Santana about how to enforce a visitation order.  Defendant came in the following day and provided the court order to Santana.  Santana then contacted E.R., who knew nothing about the custody orders, indicating she had never been served in the family law case.  E.R. also informed Santana that she had been harassed by defendant,

---

[4]     While cross-examining the security guard about what caused the guard to notice defendant, the guard indicated he had years of experience working at the site and it was different to have someone walk up to him that way, to which defendant added, "I would agree, *having picked up children from school before*, you wouldn't do it on a sidewalk in front of a school."  (Italics added.)

that there were outstanding restraining orders, and that defendant had been arrested for offenses relating to harassment of E.R. by defendant.

Santana also contacted Jazmine regarding the proofs of service. Jazmine initially claimed to have served the documents, but when she was told E.R. did not live at the Magnolia address, Jazmine admitted she never served the subpoenas and gave the documents back to defendant. Jazmine denied signing the proofs of service and said the signature on the form was not hers.

When E.R. learned about the court order for visitation from Investigator Santana, it made her scared because she thought defendant wanted to kidnap M.R. When E.R. met with Santana in October 2019, she showed him a post she had seen on Facebook in which defendant stated he was going to the girls' school to pick them up "on the 11th."[5] Having learned about the visitation orders obtained by defendant, the Facebook post made E.R. afraid, so she did not send the girls to school for a week.

3. *Perjury and Offering False Documents for Filing Evidence*

In pursuit of establishing a familial relationship with E.R.'s children, defendant initiated family law proceedings, using the name Robert Vanleeuwen[6] on documents.

---

[5] E.R. spoke to Investigator Santana in October 2019, so we assume that when she referred to the "11th," she meant October 11, 2019.

[6] Defendant informed the trial court that he preferred to go by the name Vanleeuwen, and the prosecutor indicated no objection to defendant's preference insofar as the surname is the maiden name of defendant's mother, although the People preferred that defendant's legal name be used in the trial proceedings. E.R. knew him by the name of "Roberto Vanleeuwen", as did Jazmine.

16

On June 13, 2019, defendant filed a petition to establish a parental relationship with M.R. in the family court. The petition alleged under penalty of perjury that defendant was both the declared and biological father of M.R. and that he sought to establish paternity voluntarily. Defendant sought visitation at least one weekend a month with an additional three weeks a year, the right to attend school functions and parent conferences and day visits. Defendant also requested that M.R.'s last name be changed to Vanleeuwen, his alias and the name under which he filed the family court documents.

Also on June 13, 2019, defendant filed a request for order in family court, seeking visitation with M.R.[7] Defendant also filed a request for a restraining order against E.R., for visitation, and child support. In that document, defendant averred he was the father of M.R., and, attached to his request for order, defendant filed a declaration under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.), executed under penalty of perjury, asserting that he was M.R.'s father and that at various periods of time, E.R. and the children cohabited with him.

On June 19, 2019, defendant filed a proof of service which purported that Jazmine had personally served E.R. at 11473 Magnolia Avenue, in Riverside, California on June 11, 2019, which formed the basis for Count 5. Defendant also filed proofs of service respecting the parentage and visitation documents, as well as the application for the restraining order, purportedly signed by Jazmine, who had been enlisted to serve the

---

[7] The documentary exhibits forming the basis for the perjury and falsified documents counts were transmitted to this court for our consideration.

papers on E.R. However, Jazmine never actually served the documents on E.R. personally and the signature on the proofs of service was not hers.

A second proof of service was dated June 25, 2019, purporting to show that Jazmine served E.R. But Jazmine testified that she did not make any efforts to serve E.R. that day and never filled out the proof of service form; indeed, the signature and handwriting on the form was not Jazmine's. Even the address on the form was wrong, insofar as it was Jazmine's old address and not the one where she currently lived.

On July 1, 2019, defendant filed another proof of service of summons stating that Jazmine had served E.R. with a petition to establish parental relationship on June 25, 2019. (Count 6.) On August 14, defendant filed a request to enter default, executed under penalty of perjury in the family court proceeding. (Counts 8 & 9.) On August 29, defendant filed a request for a restraining order. (Counts 10 & 11.) It stated E.R. was defendant's "ex- fiancé of approx. 8 years" and requested a return of the wedding ring for which he was still paying. The court issued a restraining order against E.R. but denied the request for return of the wedding ring by striking it out.

On September 10, 2019, the court granted defendant's request to enter default judgment and issued a custody order allowing for visitation with M.R. as requested in the unopposed petition. On September 12, defendant filed a request for order change for custody and visitation of M.R. (Counts 12 & 13.) It included a lengthy attachment describing a familial relationship between defendant, E.R., and M.R.

On October 15, 2019, defendant called the CAU and asked how he could enforce a court order for child custody and visitation with M.R. Upon initial research into the case,

Investigator Santana learned that defendant was using a last name that was different from his legal name as an alias, and that E.R. had an active restraining order against defendant.

Investigator Santana asked to meet with defendant on October 17, 2019. During the meeting, defendant told Santana that he and E.R. started dating in 2007 to 2008, while they were both in high school and that they had lived together for several years in Riverside, California, until their relationship ended in 2016 when E.R. accused him of domestic violence. Defendant told Santana he had been in M.R.'s "life from day one," although he did not know M.R.'s date of birth, or the hospital where she was born, even though he claimed to have gone there later that night. When asked by Santana, defendant did not have any photographs with him that would substantiate an eight-year relationship with E.R.

When Investigator Santana interviewed defendant and learned that defendant had submitted a California state form for family law (CS 909 form) relating to parentage, Santana requested that defendant submit a buccal sample for genetic testing, but defendant refused to submit a sample, stating he had previously taken a paternity test and had filed it with the court. However, Santana checked the court files and found there was no such paternity test result filed with the court.

After the district attorney's office became involved in the case, defendant changed his story and represented to Investigator Santana that he was more of a father figure to M.R. than a biological father. The district attorney's office assisted E.R. in providing the DNA evidence to the family court to prove the true parentage of M.R.

On October 18, 2019, defendant filed another request for an order for custody and visitation, containing an attachment, also made under penalty of perjury, describing a familial relationship with E.R. and M.R. and included a description of harassment by "Oscar Soto" that defendant attributed to E.R. (Counts 14 & 15.) In the request, he wrote: "'After seeking aid in enforcing visitations with the [district attorney's office] while providing statements, affidavits, and evidential support to present the undeniable fact that visitation here, lawfully awarded by the Court on September 10th of 2019, was being denied, as in personally denied. My coparent, who has expressed considerable knowledge and understanding a case or order existed, willingly suppressed the information they were provided and acted in bias against my position. Submitting for an ex parte or emergency request to change and discontinue orders.'"

On October 22, 2019, the district attorney's office recommended that the family court orders in favor of defendant be revoked, and the action be dismissed in its entirety. Still, defendant continued to litigate the family law matter to gain custody of M.R.[8] After Investigator Santana informed E.R. about the visitation and restraining orders that defendant had obtained, E.R. went to the family law court with Santana in December 2019. The family court suspended all the previous orders obtained by defendant and ordered defendant to submit to a DNA test.[9] Investigator Sherry Eversole from the

---

[8]     Defendant made filings under different family law case numbers, which were eventually consolidated.

[9]     Defendant appealed this order in (*Vanleeuwen v. E.B.R.* (May 4, 2022, E075791) [nonpub. opn.]). A different panel of this court reversed the judgment due to the trial

20

district attorney's office obtained a DNA sample from defendant. Melanie Velasco a senior criminalist assigned to the DNA section of the California Department of Justice Riverside laboratory testified at trial that she obtained samples from defendant, E.R., and the children in 2020, and the results indicated defendant was not the biological father of any of E.R.'s children. There was a zero percent chance that defendant was the biological father of M.R.

On December 5, 2019, defendant filed an "OPPOSITION to 3rd Party Request for Orders be Retracted." (Counts 16 & 17.) Defendant repeated his familial claims respecting E.R. and M.R., under penalty of perjury. On January 10, 2020, defendant appeared in family court attempting to participate in a custody mediation with E.R. On that day, Detective Vaughan and Investigator Santana arrested defendant and the order for visitation with M.R. was suspended.

Defendant continued to submit filings to the family law court, despite the DNA results and the suspension of the prior orders granting him visitation rights.

---

court's admonishment that defendant make no statements because Detective Vaughn was present, and it could impair his defense in the criminal case. This court also held the court vacated the restraining orders without notice to defendant. On remand, at our direction, the family law court issued an order to show cause to defendant requiring him to show why it should not dismiss his petition to establish a parental relationship and to vacate the restraining orders. We have taken judicial notice of the register of actions for the family law action in superior court case No. FLHE1903610, which was consolidated with case No. FLHE2103867, involving the same parties and claims, where the trial court ruled those earlier restraining orders expired on August 28, 2022, and dismissed the petition to establish a parental relationship on June 23, 2023, after due notice and opportunity to be heard in both case numbers. The court ruled that Vanleeuwen could not be the father of M.R. because another man had been judicially determined to be her father and DNA excluded defendant, while noting that the restraining orders had been vacated, and dismissed both cases with prejudice.

B. *Defense Evidence*

Defendant, who acted in propria persona, testified in his own defense. Defendant maintained that he met E.R. while he was in high school in 2008 and he was aware she was approximately three-and-a-half years older than him; in fact, E.R. was actually six years older than defendant, E.R. went to a different high school and graduated in 2003. He explained that he was a victim of domestic violence by E.R.

In June 2017, he was arrested for the third time for violating a restraining order protecting E.R. and charged with four misdemeanors. He violated the restraining orders because he did not know how to deal with the situation and hoped that E.R. would change. He pled guilty and was convicted of making criminal threats against E.R. and four restraining order violations because he did not want to be in jail. After his guilty plea, he was apparently released from jail.

Three weeks after his release from jail, defendant went to Colorado to visit his parents between August 2017 and March 2018, and he was not in California during that period. Defendant indicated he was in Colorado when the acts of vandalism occurred and denied committing those acts. He also denied being in California when E.R. found a cell phone used as a tracking device underneath her car.

However, despite the restraining orders, defendant claimed E.R. continued to communicate with defendant via social media, requesting financial help.[10] Defendant posed conditions to E.R., one of which was that they would sit down together and talk

---

[10] Defendant did not submit any social media pages to support this assertion.

22

through their problems and when he denied her request for money, E.R. became "belligerent." After defendant returned from Colorado, E.R. spoke to him by phone, indicating she was going to drop the girls off at school in case defendant wanted to see them and giving him permission to be present during school drop-off. Defendant watched the girls walk in through the gate and E.R. called him again to say goodbye. The following week he was arrested and charged with vandalism and approximately 20 counts of violating a restraining order. He was in custody on those charges between March 2018 to July 2019. He eventually accepted a plea deal because he wanted to go home and have another chance.

Prior to his release from custody, defendant was visited by attorneys that he did not solicit, who instructed him about how to seek visitation with E.R.'s children. With their encouragement and information, defendant opened a family law case. Defendant asserted that E.R. was aware of the litigation and was present in court on several occasions, although no minute orders were offered into evidence.[11]

Defendant called Jazmine from jail enlisting her aid to help him serve E.R. the family law documents. He sent Jazmine the packet of documents for the family law case with the proofs of service which he had pre-filled out, except for the dates, times, and signatures. He wrote a note in the left margin of the proof of service for Jazmine to wait

---

[11] We have reviewed all the minute orders of the family law case. The only hearings at which E.R. was present, either in person or by telephone were held after she had been contacted by Investigator Santana; she appeared in person on December 9, 2019, when DNA results were presented to the family law court after defendant had obtained the visitation and restraining orders.

23

for his call in case E.R. did not answer the door, because he was in jail and Jazmine could not call defendant. He denied signing the proof of service, claiming he did not have access to a pen in jail to sign. About two weeks after he sent Jazmine the documents to be served on E.R. he received the conformed copies that were signed by Jazmine, so he believed Jazmine had served E.R. Based on antagonistic messages that E.R. allegedly sent Jazmine following the service of the documents, defendant believed that E.R. was "just playing games" about not being served.

On September 10, 2019, the family court issued a visitation order for one weekend a month with M.R., pending mediation and defendant's completion of parenting classes. Because the order provided for "peaceful contact," defendant sent E.R. three messages, one on Facebook, one on Instagram, and one text message to her phone number. E.R. allegedly responded to one of the messages with, "go to hell." Defendant did not attempt further communication, deciding, instead, to wait until his scheduled visit approached, when he contacted E.R. by sending three messages on each platform once again. He also contacted E.R.'s mother who said that she would let E.R. know.

The next day, on October 6, 2019, defendant found multiple posts harassing him on social media from a profile with the name of Oscar Soto (Oscar), which he believed were from E.R. because of the imperfect English. Defendant posted a tribute to B.P. for her birthday, and Oscar replied under the post, "[S]he hate you. I say you left her and lied, ha, ha, quit acting child. Grow up. You never seen me. I leave. Have good life." Defendant insisted that he and E.R. were together for years and figured that she turned against him when someone told her that defendant cheated on her and lied to her.

24

Defendant did not respond to E.R.'s hostile messages because the family law attorney and the court instructed him not to fight back or do anything, telling defendant that if E.R. did not respond to his requests for visitation, that constituted a denial. Defendant contacted the district attorney's office for help and guidance in enforcing his visitation order because he believed that it was the policy and procedure of the family court to contact the district attorney's office. Investigator Santana contacted defendant and requested a meeting, at which the investigator requested a DNA sample.

Defendant was confused when he heard that E.R. claimed she had not been served and was unaware of the family court orders. In the meantime, Jazmine contacted defendant and told him that Investigator Santana and Detective Vaughan wanted to meet with her, so defendant advised Jazmine that she had a right not to talk to them and could "forego the[ir] questions at any time," but to tell them the truth. At that time, defendant believed the truth was that Jazmine had served E.R.

Defendant felt that Investigator Santana was taking inappropriate steps in filing a request in the family law court to revoke defendant's visitation order and domestic violence restraining order against E.R. Defendant opposed the request and attached additional requests for child abduction prevention orders and for E.R. to be ordered not to remove M.R. from the city and county of Riverside.

During the proceedings in the family law court, E.R. told the court that she had not been served and had not had an opportunity to respond, so the court suspended the visitation order to give E.R. a chance to respond, ordered a DNA test, and issued contact orders "to protect [defendant's] relationships with [his] daughter." The court ordered the

25

parties to return in January 2020 for mediation, and, in the meantime, defendant sent text messages to M.R., believing that they were authorized by the contact order in place.

Defendant insisted he, using the name "Robert Michael Vanleeuwen," was the biological father of M.R., and that he believed for many years that he was the biological father. Defendant has always "held out the children as [his] own." He testified that when a restraining order was put into place protecting M.R., his relationship with her suffered and he has not talked with M.R. in years. Prior to the restraining order defendant was there for M.R., tucked her into bed, helped her with her homework, and provided for her financially. He considered himself a father to both B.P. and M.R., and loved them both. He did not trust the results of the DNA test, indicating that he had sexual relations with E.R.

Defendant believed he had done nothing wrong and indicated that after he obtained the visitation order, he never approached M.R. or B.P. without E.R.'s permission and did not go to their school with the intent to pick them up.

Defendant admitted to sending a gift to B.P. at her school and to writing the book but denied having it sent it to E.R. by mail. He admitted leaving flowers and pictures on E.R.'s car. He claimed that he had additional pictures of him with E.R. and the girls, including at least 20 pages of photographs given to Investigator Eversole, but did not provide any photos of the children when they were babies.

After the family law case was dismissed, along with the restraining order and all other orders defendant had obtained, defendant filed a new family law case and continued to litigate the custody matter in family court, making court appearances even during his

26

criminal trial. Defendant continued to post on his Facebook page about E.R. and the girls. Defendant believed that if E.R. did not like the messages, she could block his profile and stop visiting his Facebook page. According to the defendant, he only has one Facebook profile, not multiple. He continues to make post on his Facebook page , even while in custody.

On cross-examination, defendant admitted he signed the documents seeking custody, visitation, and restraining orders under penalty of perjury. He also admitted he would still be trying to access M.R. if not for law enforcement, indicating he was still fighting for visitation. He claimed to have baby photographs of the children, but they were inaccessible to him while in custody. He denied lying about going to E.R.'s ex-husband's residence to exercise visitation with E.R.'s children, although he admitted typing information in the family law court forms about going to the residence of E.R.'s ex-husband with the visitation order forms in hand. But he denied he lied on the forms.

C. *Procedural History*

The People filed a first amended information charging defendant with stalking with a restraining order in place (§ 646.9, subd. (b), count 2); eight counts of filing a false and forged instrument (§ 115, counts 3, 5, 7, 9, 11, 13, 15 & 17); seven counts of perjury (§ 118, counts 4, 6, 8, 10, 12, 14 & 16); and one count of attempted child abduction[12]

---

[12]    The original information charged defendant with attempted kidnaping, but that charge was dismissed pursuant to section 1118.1. However, the court permitted the People to file an amended information charging defendant with an attempted child abduction pursuant to sections 664 and 278. In addition, the amended information modified the perjury counts so that they alleged violations of section 118, instead of

27

(§ 278, count 18). The information further alleged that defendant had a prior strike conviction for criminal threats (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)). The trial court granted defendant's *Faretta*[13] motion to proceed in pro. per.

On December 13, 2021, a jury found defendant guilty on all counts. In a bifurcated proceeding, defendant admitted to his strike prior conviction. On July 21, 2022, the trial court sentenced defendant to a total of 25 years eight months in prison as follows: the upper term of four years, doubled to eight due to the strike prior, on count 2; consecutive middle terms of one year, doubled to two years, on each of counts 4, 6, 8, 10, 12, 14, and 16; a consecutive middle term of six months, doubled to one year, on count 18; and consecutive middle terms of eight months, doubled to 16 months, on each of counts 5 and 7. The court imposed the midterm of two years, doubled to four years, on each of counts 3, 9, 11, 13, 15, and 17, all stayed pursuant to section 654. On July 27, defendant appealed from the convictions and sentence.

On June 30, 2023, a restitution hearing was held, at which the court ordered defendant to pay $2500 to the victim for moving expenses. On July 5, defendant appealed from the order for victim restitution.

---

section 118a, and changed count 10 so that it identified the restraining order after hearing as the perjury, rather than the proof of service alleged in the original information.

[13] Referring to *Faretta v. California* (1975) 422 U.S. 806.

DISCUSSION

1.  *Whether the Stalking Conviction, Based on Facebook Posts, Must be Reversed*

    *Because the Defendant's Underlying Conduct was Protected by the First Amendment*

Defendant argues the convictions on the stalking counts must be reversed because the charge was based on his conduct in posting public posts on his Facebook page which portrayed himself as a father in a custody dispute over M.R. and B.P.  Essentially he argues that to be convicted of stalking, his Facebook posts must be found to contain "true threat[s]," and the absence of any overt threats on any Facebook posts requires reversal. We disagree.

Defendant does not argue that the trial court erred in allowing the People to rely on his social media posts, along with his other harassing conduct, as evidence in support of the stalking charge.  He argues that because his speech on social media is protected activity, his conviction for stalking must be reversed.  We therefore construe his argument to be that there is insufficient evidence to support the conviction because the Facebook posts were protected by the First Amendment, and cannot form the sole basis for a stalking conviction.  This position is faulty because the record does not support the notion that the stalking conviction relies solely on the Facebook posts.  To the contrary, the conviction was based on five years of persistent unwelcome contact and tracking, amounting to harassment that culminated in defendant's statement on social media that he planned to pick up E.R.'s child without E.R.'s permission.

To the extent defendant claims the evidence cannot support the judgment if the social media posts were not considered, we review the conviction under the substantial

29

evidence standard. Under this standard, we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 (*Jackson*); see *People v. Bolden* (2002) 29 Cal.4th 515, 553, citing *People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) Where the evidence reasonably justifies the jury's findings and verdicts, the opinion of a reviewing court that the evidence might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment. (*In re George T.* (2004) 33 Cal.4th 620, 630-631, quoting *People v. Bean* (1988) 46 Cal.3d 919, 933.)

Section 646.9, subdivision (a), defines the offense of stalking. The elements of the offense are "(1) following or harassing another person; (2) making a credible threat; and (3) intending to place the victim in reasonable fear for her safety." (*People v. Uecker* (2009) 172 Cal.App.4th 583, 594.) Where, as here, a defendant has been convicted under subdivision (b) of the statute, proof of "a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party" is required. (§ 646.9, subd. (b).) Defendant does not appear to challenge the existence of the multiple restraining orders prohibiting the behavior described in section 646.9, subdivision (a).

As used in section 646.9, "a credible threat" means, "For the purposes of this section, 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of

conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section. Constitutionally protected activity is not included within the meaning of 'credible threat.'" (§ 646.9, subd. (g).)

The statute therefore expressly includes a "pattern of conduct" or a combination of communication by various means and conduct, that causes the person who is the target of the threat to fear for his or her safety or the safety of his or her family. It is not necessary that a threat be made with the actual intention to carry out the threatened act to constitute a true threat. (*People v. Falck* (1997) 52 Cal.App.4th 287, 295 (*Falck*).)

Defendant's challenge lacks merit. The totality of the evidence establishes that E.R. obtained multiple restraining orders to prevent the entire spectrum of defendant's obsessive and harassing behavior. Despite the orders, defendant continued to follow E.R., left flowers on her car, left gifts for E.R.'s daughters (including telephones), placed a cell phone on E.R.'s car to track her, showed up at her workplace and apartment, forced his way into her apartment, photographed E.R. and her children from outside her apartment, and posted photos on Facebook.

31

Further, the Facebook posts, the only aspect of the conviction challenged in this appeal, which were but one aspect of defendant's pattern of stalking behavior, were not protected by the First Amendment right of free speech because his entire course of conduct would make a reasonable person feel threatened. His ongoing posts, including one in which he stated he planned to pick up E.R.'s children from school,[14] exemplified his unrelenting obsession and were reasonably interpreted as threatening. (*People v. Lopez* (2015) 240 Cal.App.4th 436, 449 (*Lopez*) ["the question is not whether each individual expression communicated the requisite threat but whether the combination of all appellant's communications, expressions and conduct did so"].)

Defendant's sole argument is that his Facebook posts are protected activity which cannot support the conviction. Our response to this argument is twofold: (a) even if we disregarded all the inappropriate posts that defendant caused (either personally or at his direction by a third party) to appear on Facebook, there is ample evidence that defendant stalked E.R. and did so despite the existence of valid restraining orders prohibiting his harassing behavior; and (b) under the circumstances present in this case, defendant's posts were not protected activity. (*Lopez*, *supra*, 240 Cal.App.4th at pp. 453-454 [defendant's course of conduct in which he engaged constituted a credible threat so his

---

**14** The trial court ruled that defendant's filings in the family court were protected activity, but his posts on Facebook, which were reasonably susceptible to the interpretation that he intended to abduct E.R.'s children, were not, where they would make a reasonable person feel threatened. These posts post-dated defendant's conviction for criminal threats and violation of restraining orders, so there was no double-jeopardy issue respecting the juror's consideration of the Facebook posts that were unrelated to criminal threats.

communications via social media, a part of that course of conduct, were not protected under the First Amendment].)

Subdivision (c)(1) of section 646.9, provides for greater punishment if the defendant is convicted of stalking, while having been previously convicted of, among other crimes, a violation of section 422, relating to criminal threats. A person who commits a violation of section 646.9, subdivision (a), after having been previously convicted of the same offense, is also subject to more serious punishment. (§ 646.9, subd. (c)(2).) Evidence of defendant's prior conviction for criminal threats was admitted into evidence.

For purposes of section 646.9, the term "'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) The term "'course of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" (§ 646.9, subd. (f).)

The term "'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is

not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

While the offense requires that the defendant make a "credible threat" as an essential element, the "credible threat" may be verbal, written, or implied through a course of conduct. (§ 646.9, subds. (a), (g); see *Lopez*, *supra*, 240 Cal.App.4th at p. 449.) "Such threats 'pose a danger to society and thus are unprotected by the First Amendment.'" (*Lopez*, at p. 453, citing *Falck*, *supra*, 52 Cal.App.4th at pp. 296-297.)

In other words, it is a defendant's entire course of conduct, including conduct and statements to third parties that foreseeably may be communicated to a victim, that is relevant for establishing a credible threat and not necessarily any particular intent that the comments be conveyed to the victim. (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 137, citing *People v. Norman* (1999) 75 Cal.App.4th 1234, 1241, fn. 4.)

The *Lopez* case is similar to this case in many ways. There, evidence demonstrated that defendant was obsessed with the victim over a period of many years, contacted her repeatedly despite her efforts to stop him directly and through involving the police, and made clear both that he knew where she lived and where she went, and that he would not accept her ending what he perceived to be their relationship. There, the reviewing court concluded the defendant's social media posts were not protected activity because "the course of conduct in which he engaged constituted a credible threat within the meaning of section 646.9, subdivision (g)." (*Lopez*, *supra*, 240 Cal.App.4th at p. 453.)

The same is true in the present case. The defendant had forced his way into E.R.'s apartment, tracked her movements using a cell phone attached to her vehicle, slashed the tires of the vehicle she drove, showed up at her children's school, and harassed E.R. at work. Defendant attempted to inject himself into E.R.'s family by attempting to establish a parental relationship to M.R. through the family court, without E.R.'s prior knowledge. Learning that defendant stated on social media that he intended to pick up E.R.'s children from their school, a reasonable person would fear for the safety of her family.

At oral argument, defendant urged that undue emphasis was placed on the Facebook posts, and the jury should not have considered only Facebook posts made after 2019, due to potential double jeopardy implications inherent in considering earlier conduct that was merged in the prior conviction. No limiting instructions have been found in our review.

Instead, we found that the court instructed the jury using CALCRIM No. 207, that the offense charged in count 2 (the stalking charge) occurred between July 12, 2019, and January 10, 2020. The jury was further instructed that it could consider evidence of uncharged offenses (CALCRIM No. 375, referring to Evid. Code, § 1101, subd. (b)) in considering whether defendant was guilty of the crimes charged. The instruction listed the unwanted posts or communication on social media, among other conduct predating 2019, as the uncharged acts it could consider. Given that the charge of stalking includes both threatening and harassing conduct, and that no error has been claimed respecting this instruction, these acts were properly considered by the jury.

35

Defendant's Facebook posts did not constitute protected speech where it was part of a course of conduct that constituted a credible threat within the meaning of section 646.9, subdivision (g). There is substantial evidence to support the conviction.

2. *Whether the Evidence was Sufficient to Support Defendant's Conviction for Attempted Child Abduction*

Defendant argues there is insufficient evidence to support his conviction for attempted child abduction because he acted pursuant to a lawful court order. We disagree.

"When reviewing the evidence for legal sufficiency, our task is limited. We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime.' [Citation.] We make this determination using the statutory language [citation], because 'the plain language of our statute must control as to the acts which constitute the crime.'" (*People v. Coulthard* (2023) 90 Cal.App.5th 743, 753.)

Section 278 provides in part, "Every person, not having a right to custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent to detain or conceal that child from a lawful custodian . . . ." Section 278 makes criminal "the taking, concealing, or detaining of a child by one 'not having a right of custody'" from someone "'having lawful charge of the child.'" (*People v. Johnson* (1984) 151 Cal.App.3d 1021, 1024 & fn. 2(b).) This statute, which does not require a violation of a custody decree, includes "situations in which a person without *any* rights under a custody decree [takes] a child." (*People v. Howard* (1984) 36 Cal.3d 852, 861.) An attempt to

36

commit a crime occurs when a person who intends to commit a crime, but fails, or is prevented or intercepted in its perpetration. (§ 664.)

A "'[c]ourt order' or 'custody order' means a custody determination decree, judgment, or order issued by a court of competent jurisdiction, whether permanent or temporary, initial or modified, that affects the custody or visitation of a child, issued in the context of a custody proceeding." (§ 277, subd. (b).)

a. *Whether the Fraudulently Obtained Visitation Orders Excused Defendant's Conduct*

Defendant argues his conviction for attempted child abduction is invalid because there was an order granting him visitation rights. However, that order was obtained by fraud, insofar as defendant obtained it after submitting a forged proof of service of the pendency of the family court proceedings.

"Extrinsic fraud occurs when a party is deprived of the opportunity to present his claim or defense to the court; where he was kept ignorant or, other than from his own negligence, fraudulently prevented from fully participating in the proceeding. [Citation.] Examples of extrinsic fraud are: . . . failure to give notice of the action to the other party, and convincing the other party not to obtain counsel because the matter will not proceed (and then it does proceed). [Citation.] The essence of extrinsic fraud is one party's preventing the other from having his day in court." (*City and County of San Francisco v. Cartagena* (1995) 35 Cal.App.4th 1061, 1067.) "Extrinsic fraud only arises when one party has in some way fraudulently been prevented from presenting his or her claim or defense." (*Department of Industrial Relations v. Davis Moreno Construction, Inc.* (2011)

37

193 Cal.App.4th 560, 570, citing *In re Marriage of Modnick* (1983) 33 Cal.3d 897, 905; *Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 471; *Sporn v. Home Depot USA, Inc.* (2005) 126 Cal.App.4th 1294, 1300; accord, *Moghaddam v. Bone* (2006) 142 Cal.App.4th 283, 290.)

Defendant argues that although his court order for visitation was later suspended, it was in effect at the time he contacted Investigator Santana to inquire about enforcement. We disagree. Because the order was procured by fraud, it was void from its inception.

A "party procuring a judgment against another without due process of law, or by fraud, takes it at his peril." (*Lapham v. Campbell* (1882) 61 Cal. 296, 300.) "It has long been established that a false affidavit of service constitutes extrinsic fraud" and may be set aside because a party has been prevented from having his day in court. (*Sipe v. McKenna* (1948) 88 Cal.App.2d 1001, 1005.) Such a judgment is void: "A void judgment occurs when "the trial court rendering the judgment lacked jurisdiction in the 'fundamental sense,' that is, lacked authority over the subject matter or parties. [Citation.] Such a judgment ""is, in legal effect, no judgment. … Being worthless in itself, all proceedings founded upon it are equally worthless. … ' [Citation.]" [Citations.]' Because an absolutely void judgment is a nullity, it "'may be attacked anywhere … whenever it presents itself.""" (*LAOSD Asbestos Cases* (2018) 28 Cal.App.5th 862, 870.) The order for visitation was void as soon as it was made.

In *Sousa v. Freitas* (1970) 10 Cal.App.3d 660, a husband fraudulently obtained a decree of dissolution (a divorce, under former law) by serving her using the wrong name. Because she lived in Portugal, service of process was accomplished by publication using

an incorrect address for the wife. The reviewing court held the subsequent marriage of the husband was invalid because his divorce was obtained by fraud and was void. (*Id.*, at pp. 664, 667.) Once void, the judgment was "'[e]ver void, and life may not be breathed into it by lapse of time.'" (*Id.*, at p. 668.) In other words, a void order is never a valid order that can provide a defense to actions taken in reliance on the void order or judgment.

Here, defendant filed false documents in which he held himself out to be M.R.'s father and a member of E.R.'s household for years, and forged a proof of service of the custody, visitation, and restraining order document, using the name of a person who denied having completed service. The entire family law proceeding was void (including defendant's continuing efforts at later family law filings, showing the continuing risk to E.R.'s custodial rights and the persistent nature of defendant's efforts to interfere with her rights), so it could not confer any rights on defendant. In other words, defendant cannot excuse his crime using a fraudulently obtained order. It is well settled that "[n]o one can take advantage of his own wrong." (Civ. Code, § 3517.) To allow defendant to rely upon a fraudulently obtained order to evade liability for his crime (which constituted a fraud upon the court as well as E.R.) of interfering with E.R.'s custodial rights is wrong on multiple levels.

The custody and visitation order, which defendant obtained by extrinsic fraud, is void and had no legal effect because the court never legally acquired personal jurisdiction over E.R. As such, the custody and visitation orders obtained by defendant prior to the discovery of his fraud did not confer any familial status or custodial or visitation rights.

The void court orders cannot be relied upon as a defense to the crime of attempted child abduction where such defense would be tantamount to permitting defendant to profit from his own crime.

b. *Whether Substantial Evidence Supports the Jury's Finding of an Attempt*

Defendant also argues that his conviction for attempted child abduction must be reversed because his conduct did not constitute an overt act sufficient to support an attempt relying on section 21a, which states, "an attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done towards its commission." (§ 21a.). We disagree.

Because defendant challenges the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578 & *Jackson*, *supra*, 443 U.S. 307.)

The record amply demonstrates defendant committed overt acts that went beyond preparation toward completion of the crime of interfering with E.R.'s custodial rights. Defendant submitted perjured and forged documents to obtain a family law order granting him visitation. This was a direct overt act done toward the commission of the crime of attempted child abduction, where he announced on social media that he planned to pick up E.R.'s children from school. The scheme to fraudulently acquire visitation rights to inject himself into E.R.'s family and contrive a way of avoiding the criminal

40

restraining orders keeping him away from E.R. and her family, was only rendered ineffectual when he sought the assistance of the CAU in enforcing the fraudulent orders. These steps, by which he had convinced the family court to authorize contact with M.R., satisfy the definition of an attempt.

Further, during trial, defendant persistently referred to M.R. as his daughter, and offered an unsolicited statement that he had picked up the children from school himself. He continues to persist in his claims by filing petitions and appeals in this court, asserting that relationship. The void custody orders, coupled with his conduct of visiting the children's school with the admitted purpose of picking up M.R. and B.P., establish that defendant went beyond preparation towards completion of his intended abduction of E.R.'s children.

The conviction for attempted child abduction is supported by substantial evidence and the existence of a void order for visitation cannot be relied upon as a defense.

3. *Whether Count 9 Pertaining to Filing a False Document, and Counts 8 and 10 for Perjury, Must Be Reversed for Lack of False Statements*

Defendant argues that his convictions for filing false documents and for perjury, in counts 8 and 9, as well as his conviction in count 10, relating to his application for a restraining order against E.R., must be reversed because there were no false statements contained in the documents. We disagree as to counts 8 and 9, but agree as to count 10.

Count 8 referred specifically to the defendant's proffered UCCJEA declaration, while count 10 refers to the restraining order sought by defendant that was issued by the court. In each count the defendant was charged with perjury in the filed documents.

41

Count 9 also refers to the request to enter E.R.'s default, found by the jury to be a false document.  We address defendant's contentions grouped by the crimes alleged.

a.  *Perjury Section 118, Counts 8 (UCCJEA Declaration) and 10 (Restraining Order)*

Defendant asserts that count 8 the UCCJEA declaration, and count 10 the restraining order issued after hearing, are not supported by substantial evidence.  As to the UCCJEA declaration, there is substantial evidence to support the conviction.  But as to count 10 there is not.

Section 118, subdivision (a) provides in relevant part that, "every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury."  "The elements for the crime of perjury are:  (1) a willful statement, (2) the statement was made under oath or affirmation, (3) the statement involved a material matter, and (4) the witness knows the statement is false.  (*People v. Lucero* (2019) 41 Cal.App.5th 370, 406 (*Lucero*), citing *People v. Garcia* (2006) 39 Cal.4th 1070, 1091.)  "When the perjury is by declaration, the defendant must also deliver the declaration to someone else intending that it be uttered or published as true."  (*Lucero*, *supra*, at p. 406, citing *People v. Griffini* (1998) 65 Cal.App.4th 581, 583, 596.)

For purposes of section 118, subdivision (a), a false statement is "material" if it "'could probably have influenced the outcome' of the proceeding."  (*People v. Rubio*

(2004) 121 Cal.App.4th 927, 929, 933.) "An averment of truth is not a requisite to a perjury conviction." (*People v. Laws* (1981) 120 Cal.App.3d 1022, 1031 (*Laws*).) In *Laws* where the defendant had a clear intent to make a statement "'under penalty of perjury'" as evidenced by those very words following his name at the top of the page and where he submitted that declaration to a court to influence the court to make an order based thereon, the reviewing court found substantial evidence from which the jury would infer that the defendant was presenting his statements as true. (*Laws*, *supra*, at p.1031.)

Regarding count 8, a UCCJEA declaration is mandatory in family law matters pertaining to children. "The UCCJEA applies in a 'child custody proceeding'—which, is defined in part as 'a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue' (§ 3402, subd. (d))—commenced on or after January 1, 2000. (§ 3465.) "'It is well settled in California that the UCCJEA is the exclusive method of determining subject matter jurisdiction in custody disputes involving other jurisdictions.'"" (*In re Marriage of Kent* (2019) 35 Cal.App.5th 487, 493, quoting *Ocegueda v. Perreira* (2015) 232 Cal.App.4th 1079, 1084.)

In executing documents under penalty of perjury, defendant averred under penalty of perjury that he had no information about restraining orders in effect. Yet, E.R. had obtained multiple restraining orders against defendant, naming herself and her daughters as protected persons, and the superior court had issued criminal restraining orders following defendant's conviction for criminal threats and vandalism. This was a false statement made under penalty of perjury.

Defendant also stated under penalty of perjury that he knew of no person, not a party to the proceeding, who had custody or visitation rights, which was also false. He knew he was not the father of M.R. because E.R. met him after both her daughters were already born. Notwithstanding defendant's claim of knowing E.R. from the time he was in high school and beginning his relationship with E.R. at that time, the jury reasonably rejected this testimony because E.R. went to a different school and graduated in 2003. Moreover, M.R.'s father, who has custodial and visitation rights, lives in the State of Washington, as E.R. testified. There is substantial evidence to support the conviction on count 8.

Count 9 originally alleged defendant committed perjury respecting a proof of service declaration executed on August 14, 2019. However, in the first amended information filed by the People midtrial, the count (renumbered count 10) was modified to allege that the perjury related to the form DV-130, the restraining order issued after the hearing.

Prior to instructing the jury and closing arguments, the court and counsel had discussions about the amendments to the information. During that discussion, defendant argued that exhibit 10, the order granting his motion for restraining orders, did not contain any false statements. The People, who did not have the exhibits available, responded that although the order is signed by a judge, the order was a form filled out by defendant. However, there is no statement executed under penalty of perjury in the restraining order, although there had been such a statement in the proof of service that had been the original basis for count 10.

The lack of a false statement under penalty of perjury made by the defendant in count 10 precludes a conviction for perjury. The fact the defendant prepared the form for the court's signature (and based his request for the order on false statements) does not give rise to a perjury.

Therefore, count 10 must be reversed and resentencing is necessary.

b. *Section 115, Subdivision (a), Count 9 (Request to Enter Default)*

Count 9 of the operative information accused defendant of filing a false document with respect to the request to enter default. Defendant asserts that he should not have been found guilty of the offense pertaining to the request to enter default because the form included a request that the clerk "Please enter the default of the respondent who has failed to respond to the petition." It was true that E.R. had not responded to the petition. Defendant therefore argues count 9 must be reversed because there are no false statements in the document. We disagree.

The offense of filing a false document is committed when a person "knowingly *procures* or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States." (§ 115, subd. (a), italics added.) The word "procure" is not defined in section 115, but Black's Law Dictionary (6th ed. 1990) page 1208,contains the following definition of "procure": "To initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect, or cause. To persuade, induce, prevail upon, or cause a person to do something. [Citation.]

45

Procure connotes action and means to cause, acquire, gain, get, obtain, bring about, cause to be done."

Section 115 was designed to prevent the filing, recordation, or registration of spurious documents which were knowingly offered for record with intent to defraud. (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681-682 (*Generes*); *People v. Baender* (1924) 68 Cal.App. 49, 55.)  Even where a document appears to be genuine on its face, where it will have the effect of defrauding one who acts upon it.  (*Generes, supra*, at p. 682.)

In *Generes*, the defendant, who had no legal interest in real property, executed a deed granting an easement to herself.  The court held that it was not necessary that anyone actually be defrauded to complete the offense because the defendant's lack of ownership itself was the deception.  (*Generes, supra*, 106 Cal.App.3d at p. 682.)  Nor is it required that the writing offered for filing falsely purport to be the writing of another, because the statute refers to false *or* forged documents.  (*Ibid.*)

Cases construing section 115, have "expanded the meaning of 'instrument' to include a broader range of documents that are filed or registered with a public entity." (*People v. Murphy* (2011) 52 Cal.4th 81, 92-93.)  Such "instruments" include temporary restraining orders.  (*People v. Parks* (1992) 7 Cal.App.4th 883, 885.)  In *Parks,* the reviewing court examined the legislative intent and history in reaching the conclusion that the statute was intended to preserve the integrity of "judicial and public records." (*Id.*, at p. 887 ["Whatever else may be meant by the word 'instrument,' on these facts we

find that protection of judicial and public records such as the documents in this case was clearly within the legislative intent of section 115"].)

Here, defendant had no familial (biological or otherwise) relationship to E.R. or to her children. Yet, he falsely asserted a parental relationship to M.R. to obtain an order for visitation in order to resume contact with E.R. that had been prohibited by the criminal restraining orders. Knowing that Jazmine had been unable to serve E.R. with the documents, defendant submitted a false and forged proof of service, stating she had been served by Jazmine when, in fact, she had not, and then he sought a default judgment granting the requested family law orders.

The forged proof of service was material. A default may not be entered unless the court has acquired in personam jurisdiction over the respondent through service of process. "The clerk has no authority to enter the default of a defendant in the absence of valid proof of service of summons." (*Woods v. Stallworth* (1960) 177 Cal.App.2d 517, 520.) "A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.) In child custody matters, personal jurisdiction is required to deprive a mother of her personal right to the "immediate possession" of her children. (*May v. Anderson* (1953) 345 U.S. 528, 534.)

By submitting the forged proof of service of the requests for orders and the petition to establish a parental relationship, defendant's request for entry of default was falsely procured. There is substantial evidence to support count 9.

4. *Whether the Order for Payment of Victim Restitution Was Proper*

On June 30, 2023, the court held a restitution hearing to consider the probation officer's recommendation that defendant be ordered to pay $2500 as victim restitution, pursuant to section 1202.4, subdivision (f), to cover moving expenses. The probation officer's report noted that during the interview of the victim, she indicated she had to move several times to avoid defendant's stalking behavior, and that she transferred the children to different schools to prevent defendant from locating them. At the restitution hearing, defendant objected to the proposed victim restitution, arguing the lack of evidence and supporting material to justify the amount sought, as well as irrelevance to the charges of forging a proof of service. The court overruled the objection and ordered defendant to pay victim restitution $2500.

On appeal, defendant argues that the restitution order was an abuse of discretion where there is insufficient evidence to support the order based solely on the victim's statement to the probation officer, and because the request for restitution was not supported by verification from law enforcement or a mental health care provider. We disagree.

The California Constitution guarantees "Restitution shall be ordered from the convicted wrongdoer in every case . . . in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To implement that policy, section 1202.4, subdivision (f), provides, "Except as provided in subdivisions (p) and (q), in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an

48

amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.  If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court."

A criminal defendant "has the right to a hearing before a judge to dispute the determination of the amount of restitution."  (§ 1202.4, subd. (f)(1).)  The applicable standard of proof at the hearing is preponderance of the evidence.  (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)

On appeal, "[w]e review a restitution order for abuse of discretion."  (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498 (*Mearns*).)  Abuse is established only if the trial court's decision is arbitrary or capricious (*People v. Akins* (2005) 128 Cal.App.4th 1376, 1382) or is based on a demonstrable error of law.  (*People v. Jennings* (2005) 128 Cal.App.4th 42, 49.)  We do not reweigh the evidence or make credibility decisions; we only "determine whether there is sufficient evidence to support the inferences made by the trial court."  (*People v. Baudoin* (2022) 85 Cal.App.5th 1184, 1191(*Baudoin*).)  "A victim's restitution right is to be broadly and liberally construed."  (*Mearns*, *supra*, at p. 500.)  "'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.'"  (*Id*., at p. 499, citing *People v. Dalvito* (1997) 56 Cal.App.4th 557, 562; *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1390.)

In examining this provision, the Supreme Court has recognized, "This provision, as the Courts of Appeal have uniformly held, and as the People agree, authorizes trial

49

courts to order direct victim restitution for those losses incurred as a result of the crime of which the defendant was convicted." (*People v. Martinez* (2017) 2 Cal.5th 1093, 1101, and cases cited.)

Defendant asserts that the court erred in ordering victim restitution for relocation expenses because there was no proper verification by law enforcement. We disagree.

Subdivision (f)(3)(I) of section 1202.4 provides that for "Expenses incurred by an adult victim in relocating away from the defendant, including, but not limited to, deposits for utilities and telephone service, deposits for rental housing, temporary lodging and food expenses, clothing, and personal items. Expenses incurred pursuant to this section shall be verified by law enforcement to be necessary for the personal safety of the victim or by a mental health treatment provider to be necessary for the emotional well-being of the victim."

Defendant failed to preserve the objection relating to the lack of a verified statement to support the moving expenses in the trial court. It is well-settled that a "'"defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 354; *People v. Seijas* (2005) 36 Cal.4th 291, 302.) The rule of forfeiture also applies in the sentencing context to challenges to booking fees (*People v. McCullough* (2013) 56 Cal.4th 589, 591), presentence reports (*People v. Trujillo* (2015) 60 Cal.4th 850, 858-859), and victim restitution orders. (*People v. Mays* (2017)15 Cal.App.5th 1232, 1237-1238.)

Such a failure "'deprives the trial court of the opportunity' to create a record and to 'correct potential error in the first instance.'" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 24, quoting *People v. Lewis* (2008) 43 Cal.4th 415, 481.) Had a proper objection been timely made, the People could have procured and produced the necessary verifications. After all, Detective Vaughn testified at trial that, "She was again full— filled with fear and felt like she was being terrorized because in the history of events to that date, she had already moved several times, changed phones, completely changed her—abandoned social media, everything in her normal day-to-day life except for her job because she couldn't quit at the time. She had to change or somehow reshape due to the constant, constant presence of [defendant]."

By waiting until after the order was appealed, the People as well as the court were deprived of the opportunity to create a record and correct potential error in the first instance, so the issue was forfeited.

Defendant relies on the holding of *Baudoin*, *supra*, 85 Cal.App.5th at page 1195, which affirms the need for a verified statement of need for such expenses. However, in that case the court did not hold that all potential relocation costs are subject to section 1202.4, subdivision (f)(3)(I) and its verification requirement. "If section 1202.4[, subdivision] (f)(3)(I) is inapplicable because the relocation was for reasons not covered by that provision, restitution may still be authorized if the more general provisions of subdivision (f) of section 1202.4 are met." (*Baudoin*, at p. 1195.) Here, E.R.'s relocations were necessitated by defendant's obsession with locating her and his persistent stalking activities, directly related to defendant's stalking conviction. In this

51

regard, we are reminded of Detective Vaughn's testimony that E.R. feared defendant's stalking activity would go to a more dangerous level. Indeed, Detective Vaughn never personally dealt with anyone like defendant whose obsession has spanned this duration of time and increased.

In the present case, Detective Vaughn's testimony established the justified need for the expenses, given E.R.'s reasonable attempts to keep defendant away from her and her children, which were thwarted by defendant's persistence in tracking her down, that is to say, stalking her, despite her efforts, as well as the judicial actions to keep him away. The probation officer indicated in the sentencing report that "[Defendant's] obsession with [E.R.] and her daughter is evident by the character letters provided on his behalf. The letters indicated [defendant] has shared with his friends, what appears to be less than truthful information about his relationship and has convinced them the information is factual. Consequently, [E.R.] has relocated several times and transferred her children to another school in order to avoid the defendant finding her. Nevertheless, the defendant has managed to repeatedly locate [E.R.]. The defendant's persistence and the fact that past grants of probation and parole, along with a state prison commitment, have not served as a deterrent is of great concern. The defendant presents as a reasonable risk to [E.R.] and her family."

Despite the lack of a law enforcement officer's verification, it is apparent that, had defendant objected, a verification would have been provided. The need to move multiple times was justified and the amount requested ($2500) is modest, to say the least. A remand for further restitution proceedings to obtain a verification would not inure to

52

defendant's benefit where need is manifest from the record and is supported by the live testimony by a law enforcement officer.

## DISPOSITION

Count 10 is reversed and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

MILLER
J.

RAPHAEL
J.